1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                         :
     Plaintiff,          :
                         :
vs.                      :      Case No: 4:22-cr-199
                         :
BRADLEY EUGENE WENDT,    :      TRANSCRIPT OF MOTION HEARING
                         :      EXCERPT OF WITNESS TESTIMONY
     Defendant.          :
- - - - - - - - - - - - X


                         Courtroom 265, Second Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         Thursday, May 11, 2023


BEFORE:  THE HONORABLE STEPHEN H. LOCHER, District Judge


APPEARANCES:

For the Plaintiff:       MIKAELA J. SHOTWELL, ESQ.
                         RYAN W. LEEMKUIL, ESQ.
                         United States Attorney's Office
                         U.S. Courthouse Annex
                         110 East Court Avenue, Suite 286
                         Des Moines, IA  50309

For the Defendant:       NICHOLAS A. KLINEFELDT, ESQ.
                         Faegre Drinker Biddle & Reath
                         801 Grand Avenue, 33rd Floor
                         Des Moines, IA  50309-8011


                TONYA R. GERKE, CSR, RDR, CRR
                   United States Courthouse
                123 East Walnut Street, Room 197
                     Des Moines, IA 50309

```
 1                ***Beginning of transcript excerpt***

 2                     P R O C E E D I N G S

 3           CLINTON FICHTER, DEFENSE WITNESS, SWORN

 4           THE CLERK:  Thank you.  You can be seated.

 5           THE COURT:  Mr. Klinefeldt, when you're ready, you may

 6  proceed.

 7           MR. KLINEFELDT:  Thank you, Your Honor.

 8                     DIRECT EXAMINATION

 9  BY MR. KLINEFELDT:

10  Q.  Sir, can you please state and spell your name for the

11  record.

12  A.  Yes.  It's Clinton Michael Fichter, C-l-i-n-t-o-n

13  M-i-c-h-a-e-l F-i-c-h-t-e-r.

14  Q.  Okay.  And, Mr. Fichter, are you an attorney?

15  A.  Yes.

16  Q.  Do you have a role with the City of Adair?

17  A.  Yes, I do.

18  Q.  What is that?

19  A.  I act as our city attorney like in a general counsel role.

20  I help them with financial advice -- I am a financial advisor --

21  and just some general consulting.  I'm an experienced municipal

22  executive.

23  Q.  And how long have you been the Adair city attorney?

24  A.  I don't recall the exact date.  I've worked with the City of

25  Adair since 2014 -- October of 2014, and sometime after that I
```

1  was made city attorney, but I don't remember the day or the

2  timeframe.  Sometime before 2017.

3  Q.  Okay.  So you were the Adair city attorney on August 31st of

4  2022?

5  A.  Yes.

6  Q.  And so that's -- that's what I want to ask you about, but

7  before we get there, I want to talk to you a little bit about

8  the duties and responsibilities of mayor and city council; okay?

9  A.  Okay.

10  Q.  Generally what is the role of the mayor?

11  A.  The mayor under Iowa law is the chief executive of the City,

12  and they have, like, a mixed, dual role of some legislative

13  functions in that much like the President they can veto

14  actions -- certain actions of the council, and then they're

15  responsible for the oversight of City policies and personnel and

16  such things in the absence of a city manager.

17  Q.  Okay.  And so is it fair to say that the mayor of Adair is

18  both the chief executive officer of the City as well as the

19  presiding officer of the city council?

20  A.  Yes.

21  Q.  What sort of supervisory duties does the mayor have?

22  A.  Within the City of Adair, the mayor has -- I don't know how

23  to describe it.  They -- the mayor participates in the

24  supervision of City employees.  The City there has appointed an

25  administrator who handles most of the day-to-day supervision of

1  employees.  That was done, I believe, in the fall of '21 to

2  progress an employee that has long tenure with the City, but

3  they do participate in the supervision of the employees through

4  the administrator.

5  Q.  Okay.  Would it be -- would it be fair to say that the mayor

6  is to some degree at least the supervisor of the police chief?

7  A.  The mayor does have an extra role with the police chief.

8  The mayor under Iowa law is responsible for appointing the

9  police chief subject to the approval of the council, and they

10  are the only official that can recommend the removal of the

11  police chief.

12  Q.  And then who has the authority to remove -- I'm sorry.  Let

13  me state that differently.  What is the city council's role with

14  respect to the police chief?

15  A.  The city council has a general policymaking role with the

16  City.  They provide all the financial oversight for the

17  department.  They approve its policies, the hiring of

18  individuals, the termination of individuals.  There are certain

19  disciplinary actions that they don't have oversight over like

20  suspensions and whatnot, but, in general, it's the overall

21  policymaking that would affect the department and the approval

22  of the chief in particular.

23  Q.  And so if the mayor wanted to terminate the police chief,

24  what would be the role of the city council?

25  A.  So it's a two-step process to appoint or remove a police

1  chief.  Under Iowa law, the first step under either case is a

2  mayoral request, so the appointment is subject to the council's

3  discretion and so is the removal, but neither -- the council

4  cannot appoint or remove someone on their own.  The mayor has to

5  first make the request, and then the council has to act on that

6  request, so the council has the ultimate responsibility, but

7  they can't initiate either of them.

8  Q.  Okay.  And so ultimately it would require a vote of the city

9  council to terminate a police chief?

10  A.  Yes.

11  Q.  What about lesser discipline?

12  A.  There are some lesser disciplines that are available to the

13  city administrator and the mayor such as temporary

14  reassignments, reductions, or changes in duties, suspensions,

15  oral and written reprimands, that sort of thing.

16  Q.  And what's the city council's role in issuing discipline of

17  that nature?

18  A.  In Adair it would -- so I should have qualified that.  It's

19  somewhat different in every community because of the home rule

20  authority of municipalities in Iowa, but specific to the City of

21  Adair, if memory serves me correctly, anything that results in a

22  suspension, unpaid or paid, or termination requires the

23  council's approval.

24  Q.  Okay.

25  A.  I think that's right.  There's a policy manual that the City

1    has approved that governs that.

2    Q.   And apart from discipline, is it fair to say that the city

3    council oversees the administration of city government?

4    A.   Yes.

5    Q.   And so now let's go back to August 31st, 2022.  Were you at

6    city hall that day?

7    A.   Yes, I was.

8    Q.   And is the police station in city hall?

9    A.   Yes, it is.

10   Q.   Was there a city council meeting on August 31st?

11   A.   Yes.

12   Q.   Was that scheduled in advance?

13   A.   Yes, it was.

14   Q.   Can you tell us about what that process is and generally how

15   far in advance it was scheduled?

16   A.   I don't remember the exact reason for the meeting that day,

17   but I do know it was either -- there was a public hearing

18   scheduled, and we were taking action related to -- it was either

19   a loan that we had to issue for a water project, or it was a

20   hearing to hold a -- a building that we owned -- I can't

21   remember which of those two things it was, but I do remember it

22   was a public hearing that we had specifically scheduled for that

23   day, and when I arrived, there was federal agents there.

24   Q.   What time was the meeting scheduled for?

25   A.   I believe noon.

1  Q.  Is that typical?

2  A.  Sometimes we do noncontroversial things in a special meeting

3  like that if -- to work around people's schedules.  It's not,

4  like, a regular occurrence, but it's not irregular.

5  Q.  How often does the city council meet?

6  A.  They have one regular meeting every month on the second

7  Wednesday of the month, and then they have special meetings as

8  needed.

9  Q.  Okay.  And so this special meeting on -- there was a special

10 meeting on August 31st?

11 A.  Yes.

12 Q.  That would have been -- there would have been public notice

13 of that; is that right?

14 A.  Yes.

15 Q.  And that was supposed to occur at noon; is that right?

16 A.  I believe so.  I could supplement that with exact answers if

17 I could research it, but I honestly -- I hadn't -- I wasn't

18 prepared.

19 Q.  About then; is that fair to say?

20 A.  Yes.  It was -- I think it was noon.

21 Q.  And when did you show up for that meeting?

22 A.  Well, I tend to run late, and I was, like, right on time or

23 a little late.  I don't remember.

24 Q.  Okay.  And when you showed up at city hall for the meeting

25 that day, what did you see?

1  A.  There was -- my initial impression was is I -- in my

2  experience as a city manager, I have had a lot of instances

3  where federal or state agents for different law enforcement

4  agencies have coordinated with our local police, and it appeared

5  to be that.  I could tell that they were other levels of law

6  enforcement, and I thought they were there on some type of joint

7  action, but they were there serving a warrant on our city hall

8  apparently.

9  Q.  And when did it become clear to you that they were serving a

10 warrant on the city hall?

11 A.  I was sitting in the council meeting, and I don't remember

12 how we were told that, but we were told -- I didn't know what

13 was going on.  I thought it was all just routine things that

14 they were doing on some unrelated case to what we -- anything

15 related to our city.  I thought they were there just using our

16 facility.  I didn't know what was going on, but I think it was

17 maybe approximately a half an hour, an hour after I got there

18 that that's what I learned.

19 Q.  Okay.  So it was during the city council meeting --

20 A.  Uh-huh.

21 Q.  -- that you became aware that this was an execution of

22 search warrants?

23 A.  Uh-huh.

24 Q.  Is that a yes?

25 A.  Yes.  Yeah.  Sorry.

1  Q.  And how did -- you don't remember how you became aware of

2  that?

3  A.  I don't remember which staff member came, but I could

4  picture him.  He was the only member of the service team that

5  was wearing a suit -- came back and told us that -- asked us if

6  we would speak to them.  They asked the question about why we

7  were there, what was going on, and we told them we were having a

8  meeting, and they asked if we would be able to have statements

9  with them, and they told us what was going on.

10  Q.  Was this an FBI agent?

11  A.  I am not sure what their role was.

12  Q.  Okay.

13  A.  I believe there was agents from two different agencies

14  there.  I believe it was the FBI and the -- maybe the ATF or

15  something.

16  Q.  Okay.  Did the person identify themselves as a law

17  enforcement officer?

18  A.  They did, but I don't recall their name.

19  Q.  And what was your response?

20  A.  I don't recall saying anything.  I just said I would make

21  myself available.  I had to stay there for a few hours

22  afterwards anyway for some office time, and I made a statement

23  to the -- I believe -- his name was Kevin Kohler, I believe, and

24  then I left.

25  Q.  And so who was at the city council meeting that day?

1  A.  I don't recall if all of our members were there.  I know

2  there was at least four of the five members there.  I can't

3  remember if Jim Zimmerline was there or not, but I'm positive

4  that -- just using their first names -- Perry, Kyle, Rick, and

5  Paul were there, and I'm positive the mayor, Joanne, was there

6  also as well as us -- the city administrator, Ryan Billheimer,

7  and myself.

8  Q.  And when the agent came in to talk to you about the

9  statements, did he -- did he talk to you guys as a group?

10  A.  They had time where they spoke to us as a group, and that

11  was where they just informed us of the general nature of what

12  was happening, and then they interviewed some people separately,

13  I believe.  I think they had, like, kind of segmented out the

14  room so they could talk to people separately somewhat.  I mean,

15  it wasn't very private.  I just stayed in the city hall office,

16  and I believe that it was two agents, one of which was Kevin

17  Kohler, and me and the city clerk, Sandy, were kind of talked to

18  together in the city clerk's office.

19  Q.  How many law enforcement officers do you remember being

20  there that day other than Adair police officers?

21  A.  I'd say somewhere between 6 and 12.

22  Q.  Is that unusual to have 6 or 12 other officers there?

23  A.  I have only experienced that in times where there was some

24  kind of coordinated, like, arrest or some kind of law

25  enforcement action.  I don't -- so that was -- that's my only

1    experience with that.

2    Q.  Fair to say this is the first time you've been through

3    something like this?

4    A.  As far as I know, I haven't ever heard of a warrant being

5    served on a City like that in my time as a public servant.

6    Q.  And what was your awareness of what they were taking?

7    A.  I was unsure of what was going on, just to be honest with

8    you.  I didn't -- I was told what was -- like I had testified

9    earlier, that they were there for the service of a warrant, and

10   at that point, like, just being an attorney, I was, like,

11   wondering if I should stay there.  I -- that's kind of what I

12   was thinking, but I didn't process a whole lot of it.  I was

13   more thinking about the City than I was what was happening and

14   if there's things I needed to be thinking about for our City

15   purposes.

16   Q.  Did they show you a copy of the warrant?

17   A.  I did not ask for one, and I don't remember seeing one.

18   Q.  What did the agent say initially?

19   A.  They -- they said that there was no charges pending or

20   imminent and that they were serving a warrant for automatic

21   weapons and -- that had been obtained under law letters by

22   various entities, and the law letters had been signed by Bradley

23   Wendt, our police chief, and that they were determining if that

24   was all done correctly, I think.  That was -- that was pretty

25   much the impression I had, but they -- they did tell us that

1   there was, you know, no charges pending or imminent which I did

2   not believe.  You know, personally I felt like there was -- it

3   was way overdone for something like that, and we had not

4   received any phone calls; we had not had any coordination with

5   us prior to that, and I found that odd.

6   Q.   And so they made it clear at least that it was a criminal

7   investigation; right?

8   A.   That was my impression, yes.

9   Q.   And you knew as an attorney that search warrants are

10  generally associated with a criminal investigation; right?

11  A.   Yes.

12  Q.   And they made it clear that it was about Brad Wendt; right?

13  A.   Yes.

14  Q.   And they made it clear that at least part of it was about

15  actions that Brad had taken as the Adair police chief; right?

16  A.   Yes.

17  Q.   And so it wasn't just about Brad but potentially involved

18  City conduct as well; is that right?

19  A.   I was unclear about that, but it seemed potentially, yes.

20  It had that potential, yes.

21  Q.   And certainly they were conducting a search warrant at city

22  hall; right?

23  A.   Definitely.

24  Q.   Have you ever had that happen before?

25  A.   No.

1  Q.  And so after the agent came in and talked to the city

2  council initially, what did the city council do?

3  A.  We were -- we had finished our meeting, and they made those

4  statements that I testified to earlier, and then we kind of

5  split up, and I don't recall how long it took.  I know I was

6  there until -- I know I was there at city hall until 4:00 when

7  the clerk left and we closed city hall, and I believe that

8  everyone was gone at that point, so sometime between, I would

9  say, roughly 1 p.m. and 3:30 everybody had made their statements

10  and left for the most part.

11  Q.  And so was the city council meeting done?  In other words,

12  had it finished its -- the business it intended to finish, or

13  did it stop because of this?

14  A.  We did finish our work, but I don't recall if we had

15  finished it when they first talked to us or not.

16  Q.  And then as far as you knew, you and others went out to be

17  interviewed by law enforcement; is that right?

18  A.  Yes.  They had files on different members of the city

19  council, and I can't remember if they had one for me or not

20  but -- and they had interview questions.  They had some

21  standardized interview questions to ask so . . .

22  Q.  How do you know that?

23  A.  Because I asked what they were -- that's what they told me,

24  and then I saw the folders.

25  Q.  And so it -- you saw that they appeared to have folders for

1    each city council member and questions they wanted to ask of

2    them?

3    A.   Uh-huh.

4    Q.   Is that a yes?

5    A.   Yes.  Yeah.  Sorry.

6    Q.   And did you meet with them?

7    A.   Yes, I did.

8    Q.   Did you answer their questions?

9    A.   I believe I answered everything they asked me, yes.

10   Q.   And at the conclusion of that interview, what was your

11   understanding of what this was about?

12   A.   My understanding was that -- I was unsure what he was being

13   accused of.  I knew that there was -- I didn't know if it was

14   involving some transactions or sales that were improper or if it

15   was just simply the acquisition of them that was improper.  I

16   didn't understand -- I didn't understand what -- I'm not

17   familiar with any of these laws, so I was unsure of what was

18   happening.  I could just tell it was some kind of

19   firearms-related charges were likely for Mr. Wendt.

20   Q.   And was it your understanding that those would be federal

21   charges if they occurred?

22   A.   Yes.

23   Q.   And so you knew it was a criminal investigation; right?

24   A.   Yes.

25   Q.   You knew it involved potential federal charges against Brad

1  Wendt; right?

2  A.  Yes.

3  Q.  And you knew it was about something to do with machine guns;

4  right?

5  A.  Yes.

6  Q.  And that that -- and that it was about, at least in part,

7  law letters that Brad had wrote as the Adair police chief;

8  right?

9  A.  Yes.

10  Q.  So what did you do about it?

11  A.  I personally tried to do as little as possible with it -- to

12  participate in it.  I answered questions.  I made myself

13  accessible to the investigation.  Part of my complications were

14  I knew that I had information that wasn't privileged, but I also

15  had other information that was likely privileged, and that was a

16  difficult -- I wasn't exactly sure how to handle all that in

17  terms of the investigation and not, you know, do something

18  wrong.

19  Q.  What do you mean by that?

20  A.  Well, I knew that some of the information -- well, generally

21  everything the City does is a public record, you know, so -- but

22  there were certain things that weren't, and I was the only

23  person in possession of those, but I had a lot of information

24  about it, so I was just -- I tried to basically handle the

25  situation by answering the questions I was asked if I felt I

1  could and participating, but I didn't go out of my way to

2  involve myself in it, if that makes sense.

3  Q.  Okay.  And we certainly don't want to ask you the details of

4  what that privileged information was, but can you describe what

5  you mean, like, in other words, why it was privileged?

6  A.  Yes.  So I think I should supplement a question that you had

7  asked me earlier when you -- I think you had asked me what did I

8  do afterwards.  I -- I was thinking that immediate timeframe of

9  that day.

10        In the successive days, the city council had asked me

11  to perform an investigation into the situation to try to gather

12  all information that was available.  I attempted to interview

13  Brad.  I interviewed the staff.  I did those things in order to

14  present the council with information in a closed-session meeting

15  under Iowa law, and that was the information that I had that I

16  was going to make recommendations to them from what I had

17  obtained, and that was what I felt was probably privileged

18  information.

19  Q.  Okay.  And so let's go back to August 31st.

20  A.  Uh-huh.

21  Q.  After the law enforcement officer came and talked to you

22  during the city council session, did you talk to Brad that day?

23  A.  I did talk to Brad some.

24  Q.  When was that?

25  A.  When we were -- it was at the city hall.  I don't remember.

1  Q.  And so it would have been after law enforcement officers

2  were there; right?

3  A.  Yes.

4  Q.  Was it after the city council meeting?

5  A.  Yes, it was.

6  Q.  Was Brad at the city council meeting?

7  A.  Yes, he was.

8  Q.  Is he typically at the city council meeting?

9  A.  Him or one of his officers is, yes.

10  Q.  And so were you aware that Brad had been interviewed that

11  day?

12  A.  I saw Brad talking with the officers, but I do not know if

13  he was interviewed the same way we were.

14  Q.  Okay.  When did you see Brad talking with the officers?

15  A.  I was in our council meeting room, and I saw Brad speaking

16  with some of the staff that was there out in the hallway.

17  Q.  And so when did Brad join the city council meeting?

18  A.  During the council, he came in once or twice, I think, and

19  just checked on our meeting.  Once -- he came in once before the

20  agent came in and once -- maybe with the agent or after.  I

21  don't remember.

22  Q.  And without kind of getting into what Brad said --

23  A.  Uh-huh.

24  Q.  -- when he first came in, what was that about?

25  A.  He came in and said that they were there serving a search

1    warrant.

2    Q.   Okay.   Anything more?

3    A.   Not that I recall.

4    Q.   Okay.   And then he left?

5    A.   Yes.

6    Q.   And then the federal agent came in?

7    A.   Yes.

8    Q.   And then after the federal agent came in or around the same

9    time, Brad comes back into the city council meeting?

10   A.   Yes.

11   Q.   And what happens then?

12   A.   He explained to us -- they had given us some information

13   about why they were there, and Brad basically confirmed that

14   information, said that they had been there for automatic

15   weapons, the law letter information, that kind of thing.

16   Q.   Okay.   And did the city council ask him about it?

17   A.   I don't recall if they asked him specific questions.

18   Q.   Okay.   And so at that point when Brad comes in and talks to

19   you about what's going on, I want to ask you a few questions;

20   okay?

21   A.   Sure.

22   Q.   So we talked about that it's both the mayor's responsibility

23   and the city council's responsibility to in some sense oversee

24   the police chief; is that right?

25   A.   Yes.

1  Q.  And the mayor and city council also have an obligation to

2  generally oversee city government; is that right?

3  A.  Correct.

4  Q.  And so it would have a duty and an obligation to ask about

5  matters regarding the City; is that fair?

6  A.  Yes, it is.

7  Q.  And would it also be fair to say that they would have a duty

8  and an obligation to find out what was going on that day?

9  A.  I would be surprised if they were not asking those

10 questions, yes.  Yeah.  There was -- they did try to figure

11 things out, but I don't -- we didn't, like, talk about it in our

12 meeting like that.  I'm sure it was kind of the -- the

13 situation -- it was like a social situation almost.  There was

14 all kinds of people around, so, you know, I'm sure everybody was

15 talking about it, yes.

16 Q.  A unique situation.

17 A.  Yes, it was.

18 Q.  And so did the city council immediately try to figure out

19 what was going on?

20 A.  Not that day.  I don't recall that.  We -- the mayor and the

21 city administrator and I met afterwards, and they asked me what

22 options they had to deal with the situation, and the mayor and

23 the city administrator chose to place Brad on paid leave, I

24 believe.  They did that.  And then they told the council that,

25 and I can't remember if we dealt with it at the regular meeting

1    that was coming up.  It would have been the second Wednesday of

2    September which would have been less than two weeks in the

3    future.  I can't remember if we did a special meeting before

4    that meeting or if we did it at the regular meeting, but we

5    discussed it -- that was the first time that we discussed it at

6    a meeting that I remember with the whole council at a formal

7    proceeding at whatever meeting we had following the paid

8    suspension.

9    Q.  Okay.  So on August 31st, Brad was placed on paid leave; is

10   that right?

11   A.  Yes.

12   Q.  And who delivered that message to Brad?

13   A.  I believe Ryan Billheimer said he was going to, and I

14   believe he did, but I am not for certain on that.

15   Q.  And is Mr. Billheimer the city administrator?

16   A.  Yes, he is.

17   Q.  And so at that point when Mr. Wendt is placed on unpaid

18   (sic) leave, is it fair to say that this is an active

19   disciplinary investigation?

20   A.  Yes.  That day the other action that began is that -- so

21   when he was put on paid leave, I was charged with performing

22   that investigation that I mentioned in an earlier question.

23   Q.  Okay.  And so that day you were given direction to do the

24   investigation?

25   A.  Yes.

1  Q.  And did you do that?

2  A.  Yes, I did.

3  Q.  As part of that, did you interview Mr. Wendt?

4  A.  I attempted to, and I gave him the option of answering -- so

5  under Iowa law, we're required to provide a certain type of

6  notice to any police chief that's being considered for

7  disciplinary action, and I provided him that notice with the

8  disclaimer that he could have an attorney assist him or just

9  provide those answers back to me, and that's what I did, and I

10  believe -- I think he had retained you by then.  I believe I got

11  my answers from you or somebody else, but I don't remember.

12  Q.  Okay.  And did you also interview other people?

13  A.  Yes.

14  Q.  Did those include city council members?

15  A.  Yes.

16  Q.  And as part of those interviews, you asked them about the

17  machine guns and Mr. Wendt; right?

18  A.  Yes.

19  Q.  Did you ask them if they had talked to Brad about this?

20  A.  Yes, I did.

21  Q.  And did they indicate that they had?

22  A.  Some did, yes.

23  Q.  Did they indicate that they had talked to him after

24  August 31st about this?

25  A.  I didn't ask them about that directly.  I asked them if they

1  had talked to him about the purchasing of these guns.

2  Q.  And so is it possible that if city council members had asked

3  Mr. Wendt questions about this after August 31st that that

4  information would have been either directly or indirectly

5  conveyed to you as a part of your interviews?

6  A.  Could you ask that again?  I didn't understand that one.

7  Q.  Sure.  What I'm curious about is to the extent that city

8  council members were asking Brad what happened --

9  A.  Uh-huh.  Yes.

10 Q.  After August 31st when this all happens and it's clear that

11 it's a criminal investigation -- right?

12 A.  Yes.

13 Q.  What I'm curious about is the extent to which city council

14 members would ask Brad about it, and then when they talked to

15 other people like you --

16 A.  Uh-huh.

17 Q.  -- that they would have included that information in their

18 answers as part of your investigation.

19 A.  I don't recall receiving any information like that, but

20 they -- if they had -- they gave me everything that they had, I

21 guess, that was related to my questions.

22 Q.  Okay.  And so you may not be aware if they included that

23 information in their answers.

24 A.  Correct, yes.

25 Q.  When do you think you conducted these interviews?

1  A.  It was over the course of September.  I could go back and

2  look in my notes, but I don't -- I don't recall exactly.

3  Q.  And so I believe the meeting that you referenced was on

4  September 14th of 2022.  Does that sound right?

5  A.  Yes.

6  Q.  And you conducted your investigation prior to that?

7  A.  I know I had at least partially completed it.  I think it --

8  I think it extended beyond that meeting.  I think I had some

9  initial findings, and then I had more information I sought after

10  that.

11  Q.  And on -- you attended the city council meeting on

12  September 14th; is that correct?

13  A.  Yes.

14  Q.  And at that meeting it was made clear, wasn't it, that the

15  investigation needed to proceed under Iowa Code 80F; is that

16  correct?

17  A.  Yes.

18  Q.  And it was made clear that you were discussing disciplinary

19  options including termination; is that right?

20  A.  Correct.

21  Q.  And it was also clear at that meeting that people had talked

22  to Brad about this; is that right?

23  A.  Yes.  I -- so this would be -- I don't remember the dates on

24  this, but I do remember that there was some correspondence with

25  the -- that I had with the FBI or information I had been given

1   about that issue, yes.  I did hear about that, yes.  I believe

2   that there was -- I can't -- they came to one of our meetings.

3   There was FBI agents at our meeting, one, and I believe -- I can

4   picture -- I don't know if it's Kevin or if that's another one.

5   I don't know.  I can't place the face with the name, but we had

6   two agents attend the meeting, and at that meeting after it was

7   done, the council had reinstated Brad as our chief, and then he

8   was told he couldn't speak to people anymore at city hall.

9   Q.  And then on September 14th, that meeting, Brad was not

10  there; correct?

11  A.  I don't remember.

12  Q.  There was a period of time, wasn't there, where Brad was on

13  vacation?

14  A.  He went on a trip, I think, to, like, hunt bears or

15  something.

16  Q.  And so is it possible then that on that September 14th

17  meeting Brad wasn't there?

18  A.  Yes, it is possible.

19  Q.  But was it your recollection on September 14th people were

20  discussing information that they had received from Brad?

21  A.  They definitely could have, but we -- yes.  I mean, I don't

22  know what time they received the information, like, per your

23  earlier question, if it was pre-August 31st or after.  I don't

24  know the distinction between that, but, I mean, it's a small

25  town.  Everybody -- it's a close-knit community.  Everybody

1  talks about, you know, a lot of different things that would be a

2  larger circle than what you would see in the metro where people

3  are more disconnected.  It's --

4  Q.  Right.

5  A.  -- all different levels of personal relationships.

6  Q.  And as a city council member, they would have the right to

7  ask Brad questions; is that right?

8  A.  Yes.

9  Q.  In fact, you could say that they probably had -- they may

10 even have the duty or the obligation to ask him questions; is

11 that right?

12 A.  They have fiduciary duties to the City.  They're fiduciaries

13 of the City that have, you know, investigatory powers that they

14 usually exercise through me and all kinds of things so . . .

15 Q.  So then after September 14th, at some point you send a

16 letter to Brad; is that right?

17 A.  I don't remember the date, but, yes, I did send a letter to

18 Brad.

19 Q.  And was that on behalf of the mayor?

20 A.  It was on behalf of the City in general.

21 Q.  What was the purpose of that letter?

22 A.  I'm sorry.  I don't recall my dates very well.  I do know

23 that there was a notice that -- do you have any documents there?

24        MR. KLINEFELDT:  Your Honor, this is Exhibit X that's

25 been filed under seal and ex parte with the Court, and I would

CLINTON FICHTER - DIRECT

1  ask permission to refresh the witness's recollection about it

2  without having to unseal it or provide it to the Government

3  until Your Honor rules on this issue ultimately.

4          THE COURT:  All right.  I'll allow you to refresh the

5  witness's recollection with this document.  I'm not making any

6  final ruling about whether it's appropriately considered as

7  privileged or not, but in this context I will allow you to

8  refresh his recollection without sharing the document with the

9  City (sic).

10         MR. KLINEFELDT:  May I approach, Your Honor?

11         THE COURT:  You may.

12  Q.  Mr. Fichter, when you have an opportunity to review that --

13  please take your time -- let us know.

14  A.  Uh-huh.  Yeah.  I recall this letter now.

15  Q.  Okay.  And just to make a little bit of a record, this has a

16  exhibit sticker X on the bottom right-hand corner; is that

17  correct?

18  A.  Yes.

19  Q.  And it's a three-page document?

20  A.  Yes.

21  Q.  And the first page appears to be an e-mail; is that correct?

22  A.  That is correct.

23  Q.  Is that an e-mail from you to Brad?

24  A.  It is.

25  Q.  And is that dated October 3rd, 2022?

1  A.  Yes, it is.

2  Q.  And did you, in fact, send this e-mail and the attached

3  letter to Brad on that date?

4  A.  Yes, I did.  I thought it was a little earlier than that,

5  but apparently it was in October, not September, when I did this

6  investigation.

7  Q.  Well, had you been talking to people prior to October 3rd?

8  A.  Yes.

9  Q.  And so the -- it sounds like the investigation was going

10  kind of both before and after October 3rd?

11  A.  Yes.  I know that the -- at least once we discussed with the

12  council on what we were doing, and I believe that was the

13  September 14th meeting I presented them some options and things

14  of that nature and preliminary information, and that -- I think

15  that must have been when I was told to do the investigation

16  then.

17  Q.  And so what was the purpose of this letter?

18  A.  The main purpose that I was trying to achieve with this

19  letter was to meet the requirements of the Iowa Code 80F which

20  is the police officer -- notice of police officer bill of rights

21  which is the written notice requirement and the due process

22  requirements for an investigation into a police officer.

23  Q.  And as part of that, were you confirming any protections to

24  Brad regarding his responses to the letter?

25  A.  Yes, I did.

1  Q.  What were those?

2  A.  Can I read from this letter?  Is that okay?  Or do you want

3  me to summarize the letter?

4        THE COURT:  Let's pause for just a minute.

5        Mr. Klinefeldt, I've reviewed the letter.  I've had an

6  opportunity to read *Garrity*-related cases.  I don't

7  understand -- and I'm just talking about Exhibit X, not

8  Exhibit XX; okay?  But as to Exhibit X, I don't understand why

9  this would be privileged by *Garrity* anyway.  This was a letter

10 from the City to Mr. Wendt.  It doesn't purport to quote

11 anything that Mr. Wendt said; it doesn't purport to summarize

12 anything that he said.  I don't understand why this exhibit

13 would be potentially privileged, and we're in a situation now

14 where the witness is talking about the purpose of the letter, I

15 think, for his own ability to explain the situation.  Quoting

16 from the letter would be helpful.  I just don't understand why

17 we're treating this one as potentially privileged.

18        MR. KLINEFELDT:  Your Honor, under Iowa Code 80F.1

19 subsection (20), Iowa Code states, The employing agency shall

20 keep an officer's statement, recordings, or transcripts of any

21 interviews or disciplinary proceedings, and any complaints made

22 against an officer confidential unless otherwise provided by law

23 or with the officer's written consent.  Nothing in this section

24 prohibits release of -- and then it goes on that it -- you know,

25 based upon the officer's request, you can release these, but

1  it's the officer's choice, and so that letter is protected by

2  Iowa Code 80F, and that's why we filed it ex parte because I

3  believe the witness just testified that this would be

4  considered, at minimum, a complaint.

5  　　　　THE COURT:  So it says the employing agency has to

6  keep it confidential unless otherwise provided by law or with

7  the officer's written consent.  In a situation where you're

8  trying to use this letter as part of satisfying your burden of

9  proving that there were compelled statements, wouldn't that

10  create a situation where the law obligates this document to be

11  shared with the Government at least for the limited purpose of

12  being able to respond to the evidence that you're presenting?

13  　　　　MR. KLINEFELDT:  We could certainly do that, Your

14  Honor, but that's the whole problem here is that the Government

15  violated his Iowa Code 80F rights and his *Garrity* rights, and

16  now we're in the awkward position of having to violate them more

17  to prove that they violated them, and what should have happened

18  was a *Garrity* review where we don't have this situation where

19  the prosecutors are in the room discussing this information.

20  　　　　THE COURT:  But two different things are being

21  conflated, though, and the only reason that this document is

22  potentially covered by 80F.1(20) -- it's not because there was

23  any statement that Mr. Wendt made that's reflected in this

24  document.  There isn't.  I've reviewed it.  The only reason is

25  because it references a complaint that was made against him, but

1  given the substance of that complaint, it goes to the very heart

2  of the issues that are being litigated in this criminal case, so

3  it's not like the Government is going to receive any new

4  information that they weren't already aware of.  And there is

5  still this important "unless otherwise provided by law" language

6  in 80F.1(20), which tells me that the Iowa legislature

7  recognized that there were situations where complaints that are

8  made against an officer were going to have to be shared with an

9  adversary in litigation or in some other setting.

10        Now, if this were a civil case or something like that,

11  maybe it would be a different story, but in the circumstances we

12  have here, I don't understand why Exhibit X wouldn't be in a

13  situation where "unless otherwise provided by law" language

14  requires disclosure.  I mean, you're trying to use it in an

15  evidentiary proceeding to meet a burden of proof that the

16  Government is going to have the opportunity to provide rebuttal

17  evidence on.  I understand why you're using it.  Frankly, I

18  think you're making good progress in the larger issue, but I

19  don't understand why this particular document still needs to be

20  protected as opposed to otherwise provided by law.  So I'll hear

21  any final point you want to make on that.

22        MR. KLINEFELDT:  Absolutely, Your Honor, and might I

23  suggest that today we proceed forward with -- and I can lead the

24  witness through this -- the portions of the letter that we've

25  already conveyed in our filing and that following today what we

1  could do is I could talk to my client and at minimum file a

2  redacted version, if necessary, or if not redacted if it could

3  at least be under seal so that it's not public, but the

4  Government would nonetheless have an opportunity to address it.

5  I think that would strike the balance between protecting, you

6  know, this essentially, you know, public -- or this accusation

7  against Mr. Wendt which I think Iowa Code 80F goes to is, you

8  know, making an allegation public and preventing that along with

9  the Government's ability to respond.  And so we could either --

10 or do both -- file a full sealed copy along with a redacted

11 public copy, if that makes sense.

12        THE COURT:  Yeah.  I think generally something along

13 those lines makes sense.

14        Part of the issue I have in this moment, though, is

15 that the Government is going to be entitled to cross-examine

16 Mr. Fichter if they want to, and it's hard for them to do it at

17 least with respect to this document without having some or all

18 portions of it.

19        So let me take the easy part first.  I'm fine with

20 making this exhibit under seal as to public access to it.  That

21 part I'm comfortable with.  But in terms of its use in the

22 hearing today, I'd like to give the Government the opportunity

23 to cross-examine Mr. Fichter and not have to call him back.

24        Let me ask this, Mr. Klinefeldt.  Mr. Fichter was just

25 getting ready to quote from the document anyway.  There are a

1  number of paragraphs of this document that I don't think purport

2  to summarize a complaint against Mr. Wendt.  Instead, they're

3  just -- those paragraphs are just designed to notify Mr. Wendt

4  of certain rights that he has.  I assume that is the primary

5  purpose that you're using this document for anyway.  Is that a

6  fair assumption?

7          MR. KLINEFELDT:  Yes, Your Honor.

8          THE COURT:  What about just having the witness read

9  the paragraphs into the record where he notifies Mr. Wendt of

10  his rights and of the potential uses of Mr. Wendt's answers?

11  Why not just have him read those paragraphs into the record?

12  And I'll let you make your judgment as to which paragraphs fit

13  that description, but that way the Government at least knows

14  what he was being advised of in this document which gives them a

15  better foothold to cross-examine if they want to.

16          MR. KLINEFELDT:  One moment, Your Honor?

17          THE COURT:  Sure.

18          MR. KLINEFELDT:  Your Honor, upon conferring with my

19  client and his rights under Iowa Code 80F, we'd be agreeable to

20  just providing here and now the Government a copy of this with

21  the understanding that what would happen is that Exhibit X would

22  be continued to be sealed but would no longer be ex parte.

23          THE COURT:  Mr. Leemkuil, the Government's position on

24  that?

25          MR. LEEMKUIL:  That's acceptable to the Government.

1        THE COURT:  All right.  So Government Exhibit X -- I'm

2   sorry; it's Defense Exhibit X -- will be shared with the

3   Government for purposes of today's hearing, but it will still be

4   treated under seal, so there will be no public access to it, but

5   the Government will have the opportunity to review it today and

6   to the extent they want to to use it in their cross-examination

7   of Mr. Fichter.

8        MR. KLINEFELDT:  Okay.  I've provided a copy to the

9   Government, Your Honor.

10        THE COURT:  All right.  Thank you, Mr. Klinefeldt, and

11   you can proceed with your examination when you're ready.  I'm

12   not sure if that was the only copy you had and you need it back

13   or if you've got another one.

14        MR. KLINEFELDT:  No.  We have another copy.  Thank

15   you, Your Honor.

16        THE COURT:  All right.  Very good.

17   BY MR. KLINEFELDT:

18   Q.  Okay.  Mr. Fichter, can you remind us the purpose of this

19   letter?

20   A.  The purpose of this letter was I had written it to Mr. Wendt

21   to, number one, advise him of the 80F rules and to also

22   communicate certain items that we had been told by the

23   Government that were being considered for -- as possible

24   violations of law and to -- I asked him four questions in

25   particular related to those.

1  Q.  And was this part of the disciplinary investigation of

2  Mr. Wendt?

3  A.  Yes.  It was part of an investigation I was tasked with to

4  report back to the council on the facts, give them a factual

5  summary of what had happened, and to advise them of their

6  options under their personnel policies to handle the situation.

7  Q.  Okay.  Can you read that first paragraph for us?

8  A.  Yes, I will.

9        This letter serves as notice of an investigation being

10  conducted in violations of personnel standards and is offered in

11  compliance with Iowa Code 80F.  Under the standards of Iowa Code

12  80F, any information obtained in this investigation cannot be

13  used against you in any criminal proceedings and will be

14  considered a confidential employee record.

15  Q.  The letter then goes on to talk about kind of a summary of

16  allegations; is that fair?

17  A.  Yes.  It's the information that I had gained from my

18  conversations with the federal agents.

19  Q.  And then where did the questions come from?

20  A.  Those questions were -- I had a phone conversation with

21  Agent Kevin Kohler, and those four questions that I transmitted

22  in this letter were related to the potential allegations that

23  could be made against Brad.

24  Q.  So were these questions from Agent Kohler?

25  A.  No.  They were the -- I had asked him specifically what --

1  so to back up here one second, I had very little information to

2  go off of, and I really wasn't -- I wasn't sure what laws could

3  have been violated or may have been violated.  I wasn't even

4  sure where to start, so I began by reaching out, and I received

5  a limited amount of information from federal agents at the day

6  of the service of the warrant and then in one or two

7  conversations afterwards, the totality of which is in those four

8  questions which related to concerns over the number of requests

9  that had been made in the law letters, the number of weapons

10  that had been purchased, the number of officers that had been

11  claimed to be on the staff of the City, and whether they had

12  been bought with City funds.

13  Q.  And what was the purpose of getting answers to these

14  questions?

15  A.  The purpose was in the review of our personnel manual when I

16  met with the mayor and the city administrator was we had

17  identified those pieces of information as ones that would be key

18  to helping the council make a judgment on what to do with the

19  situation.

20  Q.  Okay.  And the paragraph above that, can you read that

21  starting with, We are offering?

22  A.  Yes.  We are offering you an opportunity to respond to

23  questions regarding these purchases in writing or through an

24  in-person interview.  You may have an attorney provide your

25  responses or attend such in-person interview.

1  Q.  Okay.  Now, was it Brad's obligation to answer those

2  questions?

3  A.  Under the personnel manual, yes.

4  Q.  And then the next paragraph states, The questions the City

5  needs to resolve are the following; is that right?

6  A.  Yes.

7  Q.  And then it lists those four questions you gave?

8  A.  Yes.

9  Q.  Okay.  What -- after the questions, what does the letter

10  say?

11  A.  Are you talking about after the numbered questions there?

12  It begins with you?  You may also provide any other information

13  that you feel is pertinent to this situation.  If you wish to

14  respond in writing, please do so by October 7, 2022; if you

15  request an in-person interview to be held at a date and time --

16  to be held at a date and time prior to 4:00 p.m. on October 7,

17  2022.  Please be advised that this investigation may result in

18  reprimand or termination of your employment.

19  Q.  And was this letter meant to comport with the requirements

20  and protections under Iowa Code 80F?

21  A.  Yes.

22  Q.  Was it meant to convey protection for Brad's -- any of

23  Brad's statements in response to it?

24  A.  Yes.

25  Q.  What about any statements he gave before that?  Would they

1  also be protected?

2  A.  My understanding would be that anything he gave us prior to

3  80F, it would be protected if we had gained them through this

4  type of investigation but not if he gave us them voluntarily

5  without being solicited, if that makes sense.

6  Q.  Okay.  He would have to be solicited for the information to

7  be protected; is that right?

8  A.  That's my understanding is I believe the 80F is covered by

9  if we are -- when I say we, I mean the City.  If we are actively

10  seeking this information to follow through on a complaint or

11  some type of disciplinary action.

12  Q.  And you guys have been doing that really since August 31st;

13  is that right?

14  A.  Correct.

15  Q.  So is it fair to say that this is merely kind of confirming

16  Brad's rights?

17  A.  Yes.

18  Q.  And I'm not going to ask you the details of it, but in

19  response to this letter, did you get a statement from Brad's

20  legal counsel?

21  A.  Yes.

22  Q.  Was that a letter?

23  A.  Yes, it was.

24  Q.  In addition, did Brad appear at the next city council

25  meeting?

1    A.   Yes, he did.

2    Q.   And would that have been on October 26th?

3    A.   I don't recall the dates.

4    Q.   Does that sound generally right?

5    A.   It could be, yes.  I know there was a special meeting that

6    we held.  You know, there was -- we talked about this in

7    successive meetings, so they kind of blur together, and I go

8    to -- I go to approximately 45 city council meetings a month for

9    different city -- I work for a lot of different cities, and it's

10   hard for me to keep track of them all, but I do -- Brad attended

11   every meeting that we discussed him at.  I know that.

12   Q.   Except for maybe September 14th because he was out of town?

13   A.   Yeah.  I don't remember if we gave Brad an opportunity to

14   talk at that one or if -- but we -- every time we gave him an

15   opportunity to speak to us, he did.

16   Q.   And so on October 26, that meeting, the city council was

17   provided a copy of the letter from his counsel; is that right?

18   A.   Yes.

19   Q.   And had a chance to review it; is that right?

20   A.   I believe so.  Could I ask for some clarification on --

21   Q.   Yeah.

22   A.   I believe the meeting you're talking about is the meeting

23   where the council reinstated Brad to his full --

24   Q.   Correct.

25   A.   -- title and everything?  Yes, then that's correct.

1  Q.  Yeah.  And so the meeting I'm talking about is the meeting

2  at which Brad got reinstated.

3  A.  Yes.

4  Q.  Okay?

5  A.  I remember that meeting, yes.

6  Q.  And it was made clear at that meeting that -- it was closed

7  session; correct?

8  A.  Yes.

9  Q.  And what does that mean generally, when the city council

10  goes into closed session?

11  A.  Under Iowa law, the city council generally has to hold all

12  of its proceedings in public meetings, meaning that no one can

13  be excluded.  You know, you can live anywhere; you can be from

14  anyplace, and you can attend the meeting with the exception of a

15  list of certain items which the City is allowed to exclude the

16  public from.  There is a particular exception to the public

17  meeting rules, and that is for the discussion and evaluation of

18  employee conduct that has the potential to damage their

19  reputation or cause them embarrassment, and that's the section

20  that we used to discuss that out of the public meeting.

21  Q.  Does the employee have to request that?

22  A.  Yes.

23  Q.  Okay.  And so to get this straight, it will be a

24  situation -- the city council's going to discuss it regardless,

25  but the employee has the option to either request it be closed

1  session or open; correct?

2  A.  Correct.  The council cannot hold it in closed session

3  without the employee's request.

4  Q.  And so Brad attended that meeting; right?

5  A.  Yes.

6  Q.  And at that meeting the mayor and others asked him questions

7  about this topic; is that correct?

8  A.  Yes.

9  Q.  And was that also part of the investigation?

10 A.  That was pretty much its conclusion, yes, was to validate --

11 I provided them a report, and the report contained my best

12 attempt at an objective summary of the facts and the options,

13 and then they held discussions between themselves and Brad off

14 of that.

15 Q.  And so that report you're talking about is separate from the

16 letter you received from his counsel; correct?

17 A.  Yes.  There was two documents, one from the -- Brad's

18 counsel and the other from me.

19 Q.  And then they discussed it with Brad; correct?

20 A.  Yes.

21 Q.  Asked him questions?

22 A.  Yes.

23 Q.  And then held a vote; correct?

24 A.  Yes, correct.

25 Q.  And they reinstated him; is that right?

1  A.  They did.

2  Q.  And at that meeting regardless of how the questions were

3  phrased, Brad had a duty to respond to their questions; is that

4  correct?

5  A.  Yes.  I can't remember the exact verbiage, but failure to

6  participate in an investigation of this nature is a disciplinary

7  action in and of itself.

8  Q.  And termination was certainly something that was being

9  considered; is that correct?

10  A.  Yes.

11  Q.  And actively discussed?

12  A.  Correct.

13  Q.  In front of Brad?

14  A.  Yes.

15  Q.  Following the reinstatement of Mr. Wendt on October 26th of

16  2022, were you contacted by the Government with a grand jury

17  subpoena?

18  A.  Yes, I was.

19  Q.  Can you tell us about that?

20  A.  Yes.  I -- I believe I got two different subpoenas.  I

21  don't -- I think there was one for records and one for me

22  personally.  I don't remember 100 percent, but I do know that

23  there was at least two subpoenas, one for records.  I can't

24  remember if they were both directed at me individually, but I

25  helped the city clerk retrieve certain documents and files for

 1  the Government, and then I was asked to appear here for the

 2  grand jury.

 3  Q.  Okay.  And did you appear in front of the grand jury?

 4  A.  I appeared for -- to make myself available, but I wasn't

 5  called.

 6  Q.  Did you produce materials in response to the grand jury

 7  subpoena?

 8  A.  Yes.

 9  Q.  Was that on behalf of the City?

10  A.  Yes.

11  Q.  Did they include any of the closed-session recordings?

12  A.  Yes.

13  Q.  Why are the closed-session meetings recorded?

14  A.  There's a requirement under Iowa law.

15  Q.  When do you think you would have provided those to the

16  Government?

17  A.  I don't remember the date.  We had a little bit of back and

18  forth over what was covered by the request and what wasn't, and

19  those recordings were the last things that we provided I

20  remember.  I provided Brad's personnel file with some material

21  exempted out of it.  I later provided what was exempted, and

22  then also there was some minutes that they had requested, I

23  believe, as well as some closed-session documents.  I believe

24  those were also given in two separate transactions with the

25  closed-session tapes eventually being provided.

CLINTON FICHTER - DIRECT

43

1   Q.  Tell us about the back and forth.

2   A.  I don't recall, you know, too much.  I believe I was

3   talking -- I know it was --

4   Q.  Would it be Mr. Leemkuil?

5   A.  Yeah.  I couldn't remember his name.  I'm sorry.  Yes, it

6   was.  But it was with them, and, you know, the -- we had more

7   discussion about these two letters that we were discussing.

8   Those were not provided.  I considered those privileged, and I

9   was highly worried about providing those, so I did not provide

10  those, but everything else I did provide, and I remember I

11  wasn't sure if I should provide the closed-session tapes and how

12  I -- and the material I exempted out of the personnel file, and

13  eventually they gave me a rationale that made sense to me, and

14  it was, you know, that the federal subpoena wasn't related to

15  state law, and I didn't really think about it at the time.  I

16  provided them.

17  Q.  Tell us about the discussion regarding the letters.  What

18  did he ask, and what did you tell him?

19  A.  He asked for -- so I believe in the recordings we were

20  referencing -- I can't -- it might have been the recordings, or

21  it might have been one of the written documents, the minutes,

22  but something referred to the letters that alerted the

23  Government to the existence of those letters, and they asked me

24  for them, and I asked for -- so kind of in between then -- in

25  between when I provided the closed-session records and in

1  between those questions, I had, you know, become concerned that

2  some of those things were privileged or shouldn't have been

3  given, but I was uncertain.  But I felt very certain that the --

4  my work products were privileged, and I asked for any type of

5  rationale that could support providing my work product to the

6  Government for my client, and I wasn't given a satisfactory one,

7  so I didn't provide them.

8  Q.  And so one issue is your attorney-client privilege with the

9  City; correct?

10  A.  Yes.

11  Q.  Another issue is the Iowa Code 80F protections of certain

12  matters; is that correct?

13  A.  Correct.

14  Q.  Did you ever talk to Mr. Leemkuil about those protections

15  and your concerns?

16  A.  I believe through e-mail, yes, I did.

17  Q.  Tell us about that e-mail.

18  A.  I don't recall all the back and forth.  It was fairly

19  stressful.  I remember telling them that, you know, I don't --

20  I'm not used to dealing with these issues.  It's fairly complex.

21  I mean, there's, like, a lot of moving parts legally to this.

22  There's issues of privilege; there's issues of federalism;

23  there's issues of all kinds of different things, individual

24  rights, so it was complicated from my perspective, and I would

25  characterize their response as fairly aggressive on trying to

1  obtain those, and I just basically, you know -- I didn't think I

2  had a good answer.  I mean, I didn't know -- I felt like

3  anything I could do could potentially be viewed as wrong, so I

4  just did nothing.

5  Q.  And was this just e-mail correspondence, or were there also

6  telephone conversations?

7  A.  I don't recall.  I know for certain there was e-mails.

8  Q.  Do you remember ever alerting Mr. Leemkuil that these

9  documents may be protected by Iowa Code 80F?

10 A.  Yes, I believe I did.

11 Q.  What was his response?

12 A.  Well, we had discussed it prior to that also, and I believe

13 that the Government's theory was that the -- you know, basically

14 the supremacy issues of the -- you know, the federal

15 constitution and federal law trumped our state laws and allowed

16 them to receive those documents.  I believe that was his theory.

17 Q.  At some point during that exchange, did Mr. Leemkuil send

18 you a case in support of his argument?

19 A.  I don't recall.

20 Q.  Did you guys discuss the law at all?

21 A.  We did, yes.

22 Q.  Do you recall him ever citing an Eighth Circuit case to you

23 that dealt with this issue and whether the Government was

24 nonetheless entitled to this information despite Iowa Code 80F?

25 A.  I don't remember an exact case.  I remember him talking to

Case 4:22-cr-00199-SHL-HCA   Document 228   Filed 07/05/23   Page 46 of 66

CLINTON FICHTER - DIRECT

46

1  me about it.  He may have mentioned the case, but I don't -- I'm

2  sorry.  I don't recall.

3  Q.  If I -- do you remember sending me the case?

4  A.  I remember asking for -- I basically wanted to ask you what

5  your position on releasing these things was, because I knew if

6  I -- if you had blessed it, I could do it.

7  Q.  If I showed you that case, would it help you refresh your

8  recollection?

9  A.  Yeah, or if you had an e-mail, that would be ideal too.

10         MR. KLINEFELDT:  Your Honor, may I approach?

11         THE COURT:  You may.

12  Q.  Mr. Fichter, please take your time to review that case, and

13  when you're ready to answer the question, please let me know.

14  A.  Okay.  I do -- I do remember this, yes.

15  Q.  What do you remember about it, sir?

16  A.  So at the end of our back and forth, the Government's

17  position was that I could potentially be held in contempt for

18  not releasing those records, and they had communicated that to

19  me, and I believe this was provided as part of that discussion.

20         MR. KLINEFELDT:  Your Honor, may I approach the bench

21  and provide Your Honor a copy of the document that we're

22  referring to?

23         THE COURT:  You may, or if you just want to give me

24  the citation, that will be fine too.

25         MR. KLINEFELDT:  I have an extra copy here.

 1          THE COURT:  Okay.

 2    Q.  Mr. Fichter, do you remember if the government sent you that

 3    case, like a physical copy?  I mean a -- did they actually send

 4    you the case, or did they just give you the citation?

 5    A.  I don't recall.  I just don't recall.  I'm sorry.

 6    Q.  Okay.  But at minimum they gave you the citation?

 7    A.  He did provide me some information about this, and I -- I

 8    basically, to be honest, didn't read this.  I remember reading

 9    the caption and the summary from the -- it looks -- I can't

10    remember if this is from one of the Reporters, but I -- I had

11    made a decision in my mind that I wasn't going to comply with

12    whatever they said.

13    Q.  Did you go make a copy of the case and send it to me, or is

14    it something that somebody gave you?

15    A.  I believe I was -- I didn't make any copies of anything.  I

16    know that so . . .

17    Q.  Did you pull anything off of Westlaw?

18    A.  No.  I don't have Westlaw access.

19    Q.  Okay.  And so if you sent it to me, then that means the

20    Government sent it to you?

21    A.  Correct, yeah.  If you have it, yes, that would be correct.

22    Q.  The --

23          MR. LEEMKUIL:  Your Honor, I'll stipulate that I sent

24    him the case.

25          THE COURT:  Thank you.

CLINTON FICHTER - DIRECT

1  Q.  And was -- was that case part of your reasoning to then go

2  ahead and provide the closed-door sessions to the Government?

3  A.  No.  That was just off the conversation.  The closed-session

4  tapes were off the conversation in which they -- I asked for

5  some -- I go, Well, I don't think I'm supposed to release these,

6  and he had said, Well, you know, this is a federal law; it's not

7  a state law, and that -- at that time that made sense to me, and

8  I told the clerk just to go ahead and release them to him.

9  Q.  And then was it after that that he sent you this case?

10  A.  Yeah.  I believe this came up in regard to our memos that --

11  where he referred to at the meeting of October 26th, those two

12  memos.

13  Q.  Okay.  Do you recall when Mr. Leemkuil would have sent you

14  this case?

15  A.  I don't.  I'm sorry.

16  Q.  Okay.

17  A.  I do know it was after the grand jury date.

18  Q.  Your --

19  A.  Yes.

20  Q.  -- grand jury day?

21  A.  Yeah.

22  Q.  Do you remember if it was before Brad was indicted?

23  A.  It was after Brad was indicted I know.

24  Q.  And so were you called in front of the grand jury

25  approximately December 14th?

1    A.   I don't remember the date.  I'm sorry.

2    Q.   Okay.  And was it -- was this provided in December you

3    think?

4    A.   I believe it was.  I know that when I came to the grand

5    jury, I wasn't sure if Brad was going to be charged or -- I

6    didn't know anything, and I know I hadn't provided that.  I know

7    we hadn't had this back-and-forth the day I came, and I came for

8    the grand jury -- if that was the date, I'll trust you on that,

9    but the day after was when he was charged.

10   Q.   Okay.  And it was after your grand jury appearance do you

11   think that you got this case?

12   A.   I know it was, yes.

13   Q.   Okay.  And then at some point after the indictment, Brad's

14   suspended again; is that correct?

15   A.   Yes.

16   Q.   And there are additional city council meetings where this is

17   discussed; is that correct?

18   A.   Yes, there was.

19   Q.   There was one on December 19th; is that right?

20   A.   That sounds like it could be correct, yes.

21   Q.   And at that one he was not reinstated; correct?

22   A.   This is the best of my recollection was -- the first time

23   they reinstated him, they told him they would reconsider it if

24   charges were filed against him.  Charges were filed, the mayor

25   suspended him again, and then they had a discussion on whether

1  or not they wanted to keep that.  The council reinstated him

2  again, and I don't remember the timeframe of when that -- how

3  much time elapsed.

4  Q.  When he was reinstated, was that on January 11th, 2023?

5  A.  I believe, yes.

6  Q.  And that was at a city council meeting; correct?

7  A.  Yes.

8  Q.  And at both the January 23 and December 22 meetings, Brad

9  was present and answered questions; is that correct?

10 A.  If your dates are correct, he was at those -- the meetings,

11 yes.

12 Q.  And at both of those meetings, though, the city council was

13 asking him questions about this; is that correct?

14 A.  Yes.

15 Q.  And were those statements also protected under Iowa Code

16 80F?

17 A.  I believe, yes.  That would be my interpretation.

18 Q.  And Brad's criminal case clearly hasn't been resolved yet;

19 is that fair to say?

20 A.  Yes.

21 Q.  Is it also fair to say that the City's investigation

22 essentially is going to continue until Brad's case is resolved

23 and they know what that resolution is?

24 A.  I believe that was the intention of the council.  That's

25 what was stated at meetings, I believe.

1  Q.  And Brad remains subject to potential termination over this

2  matter; is that correct?

3  A.  Yes.

4  Q.  And whenever he appears at city council, he's obligated to

5  answer questions; is that correct?

6  A.  Yes.

7        MR. KLINEFELDT:  One moment, Your Honor?

8        THE COURT:  Yes.

9  Q.  Mr. Fichter, did you ever feel intimidated by the Government

10  in this case?

11  A.  I could tell that they were trying to intimidate me a

12  little, but I wasn't really.  I mean, I thought it was just kind

13  of a little bit of just trying to get me to do what they wanted

14  to, but it didn't seem that serious.

15  Q.  And lastly, just for the record, the case that we were

16  referring to that the Government sent you, is that In Re:  Grand

17  Jury Subpoena dated August 14th, 2019, from the United States

18  Court of Appeals 964 F.3d 768?

19  A.  Yes.

20  Q.  And that's a 2020 case; is that correct?

21  A.  Correct.

22        MR. KLINEFELDT:  No further questions, Your Honor.

23        THE COURT:  All right.  Mr. Leemkuil,

24  cross-examination?

25        MR. LEEMKUIL:  Thank you, Your Honor.

1        CROSS-EXAMINATION

2  BY MR. LEEMKUIL:

3  Q.  Mr. Fichter, did you ever tell Brad Wendt that he would be

4  fired if he did not speak or answer questions?

5  A.  I did not, no.

6  Q.  Did you ever hear anyone tell Brad Wendt that he'd be fired

7  if he did not speak or answer questions?

8  A.  I did not.

9  Q.  You mentioned that Mr. Wendt was placed on leave after

10  August 31st, 2022; correct?

11  A.  Yes.

12  Q.  And was he reinstated in October of 2022?

13  A.  I believe those are the date -- my dates -- I'm sorry.  My

14  dates are just fuzzy.  I don't remember.  But, yeah, he was

15  reinstated at some point after this investigation which I

16  wrapped up on October 7th.

17  Q.  And was he reinstated by a vote of the city council?

18  A.  Yes.

19  Q.  Did Rick Stanley vote to reinstate Brad Wendt?

20  A.  Yes, he did.

21  Q.  Did Perry Leeper vote to reinstate Brad Wendt?

22  A.  Yes.

23  Q.  And you mentioned, I think, that Mr. Wendt was, again,

24  placed on leave after the indictment came down in December?

25  A.  Yes.

1  Q.  Was he again reinstated in January of this year?

2  A.  I believe that date's correct, yes.

3  Q.  Do you know who voted -- I guess, do you know the breakdown

4  of the vote in January?

5  A.  I don't remember the breakdown in January.  I do remember

6  that we were missing members at that meeting, so it wouldn't be

7  a full tally of the council.  I want to say it might have been

8  three to zero.  I don't remember.  It might have been three to

9  one, but I know the earlier one was three to two.

10 Q.  In the January vote, did Rick Stanley vote to reinstate Brad

11 Wendt?

12 A.  Yes, I believe so.

13 Q.  Did Perry Leeper vote to reinstate Brad Wendt?

14 A.  I believe, yes.

15 Q.  You were asked a question about the City of Adair's

16 disciplinary policy.  Do you recall some of those questions?

17 A.  Yes, I do.

18 Q.  And you mentioned that in your view Brad Wendt had an

19 obligation to answer the council's questions; correct?

20 A.  Yes.

21 Q.  Is that based on a portion of the policy that says an

22 employee may be subject to discipline based on a failure to

23 provide information?

24 A.  I can't remember how it's worded, but there's a list of

25 things that are provided, and I believe that failing to

1    participate -- I know that failing to sign disciplinary notices

2    and things like that is a grounds for some additional

3    discipline, and I believe failing to participate in an

4    investigation is too.

5    Q.  Do you know whether the policy says that an employee will be

6    terminated for those issues or that they may be terminated?

7    A.  It's always discretionary.  I know that.

8           MR. LEEMKUIL:  Nothing further, Your Honor.

9           THE COURT:  Mr. Klinefeldt, any follow-up?

10                     REDIRECT EXAMINATION

11   BY MR. KLINEFELDT:

12   Q.  Mr. Fichter, what would have happened if Mr. Wendt told you

13   and the city council flat out, Regardless of what protections

14   you give me, I'm not answering any questions?

15          MR. LEEMKUIL:  I'd object.  Calls for speculation.

16          THE COURT:  Well, I'll let the witness answer the

17   question as well as he is able.

18   A.  I -- I believe that if that had been communicated, the

19   result would be uncertain.  There was members that felt that he

20   should be terminated, and there was ones that didn't.  I do not

21   know if the ones -- I mean, it was one vote, so I don't know if

22   that information would change anybody's mind, but it was very

23   close.

24   Q.  Right.  Well, even with the information, there were some

25   members that wanted to terminate him; is that fair?

1  A.  Yes.

2  Q.  And I believe you said he had an obligation to answer the

3  city council's questions; is that correct?

4  A.  That's my interpretation of it, yes.

5           MR. KLINEFELDT:  No further questions, Your Honor.

6           THE COURT:  Mr. Leemkuil, any recross to that?

7                     RECROSS-EXAMINATION

8  BY MR. LEEMKUIL:

9  Q.  To be clear, Mr. Fichter, did you ever hear anyone tell Brad

10  Wendt that he had to either answer questions or be fired?

11  A.  No.

12           MR. LEEMKUIL:  Nothing further, Your Honor.

13           THE COURT:  All right.  Mr. Fichter, you're excused.

14  Thank you.

15           THE WITNESS:  Who do I give the exhibits to?

16           THE COURT:  You can just leave them -- actually why

17  don't you give them back to Mr. Klinefeldt since there are

18  potential privilege issues there.

19           THE WITNESS:  Okay.  Thank you.

20           THE COURT:  Mr. Klinefeldt, I've got to give the court

21  reporter and really all of us a break.  Give me a sense.  I know

22  we've got three witnesses to go.  How long are you expecting

23  each of those witnesses?

24           MR. KLINEFELDT:  Your Honor, if we could have a brief,

25  you know, break, whatever's, you know, important for the court

1    reporter, we can convene and see if we can streamline this a

2    little bit.  We have three witnesses, but we may not need to

3    call them all.

4            THE COURT:  Okay.

5            MR. KLINEFELDT:  I'm sure the Court has a deadline

6    here at some point approaching lunch.

7            THE COURT:  Well -- so I've got enough time.  Where

8    we're going to run into problems is court reporters because

9    Tonya needs to go handle a different hearing this afternoon.  So

10   I want to give you as much time as I can, but I need to make

11   sure she gets the breaks she needs and that we've got coverage

12   for other hearings that are this afternoon, so why don't we take

13   20 minutes right now.  You talk to the Government if you need to

14   or whoever you need to to think about streamlining, and then

15   we'll just start when we get back on figuring out how much more

16   ground you think you have to cover and how long it's likely to

17   take, and then we'll figure out a schedule from there.

18           MR. KLINEFELDT:  Thank you, Your Honor.

19           THE COURT:  All right.  For now we're adjourned.

20           (Recess at 11:08 a.m. until 11:29 a.m.)

21           THE COURT:  Please be seated.

22           Mr. Klinefeldt, during the break, were you able to

23   give some thought to where we are from a scheduling standpoint?

24           MR. KLINEFELDT:  Yes, Your Honor.  We had subpoenaed

25   here today, in addition to Mr. Fichter, Perry Leeper, Rick

1  Stanley, and Joanne Byars.  During the break, we conferred with

2  the Government, informed them that it's our intention not to

3  call any of those three witnesses and that we would call

4  Mr. Wendt now.  That would be very brief.  And we asked if they

5  could be excused from their subpoenas.  I believe they had no

6  objection to Mr. Leeper and Mr. Stanley being released, and if

7  that's the case, I would ask the Court's permission to go tell

8  them that they could leave.

9          THE COURT:  Pause on that one for a minute.

10          Mr. Leemkuil, Ms. Shotwell, does the Government have

11  any objection to me excusing or releasing Mr. Leeper and

12  Mr. Stanley from their subpoenas?

13          MR. LEEMKUIL:  Your Honor, Ms. Shotwell and I just

14  conferred, and I think our preference -- Mr. Klinefeldt

15  indicated that his client will be testifying during the hearing.

16  It would be our preference to wait until after he testifies to

17  release those witnesses just in the event that we determine

18  there's a need to call one of them based on Mr. Wendt's

19  testimony.

20          THE COURT:  Mr. Klinefeldt, how long do you anticipate

21  Mr. Wendt's testimony being?

22          MR. KLINEFELDT:  Five minutes.

23          THE COURT:  All right.  Then I'll wait to excuse them

24  until the conclusion of that testimony.  I don't -- I think I

25  may have interrupted you before you were done talking about how

1   you wanted to proceed, Mr. Klinefeldt.

2           MR. KLINEFELDT:  No.  I think that covers it, Your

3   Honor.  I was going to say that there -- the Government may have

4   had an interest in calling Ms. Byars, but I think they've just

5   addressed that in terms of making the decision later.

6           THE COURT:  Okay.  Yeah.  Got it.

7           So I don't know, Mr. Wendt, candidly whether I need to

8   engage in a brief colloquy with you before your testimony in

9   this proceeding, but I know at trial I would have to.  I just

10  want to remind you you do have a Fifth Amendment right.  You do

11  not have to testify in this hearing or in any other hearing

12  regarding this matter.  Whether or not you decide to testify is

13  entirely up to you, but before you take the stand today, I just

14  want to confirm.  Have you had an opportunity to visit with

15  Mr. Klinefeldt about your Fifth Amendment rights?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  And are you -- assuming you do take the

18  stand here in a minute, is that a knowing decision that you feel

19  comfortable that you've been counseled on the pros and cons of

20  that decision?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  All right.

23          Mr. Leemkuil, Ms. Shotwell, is there any other record

24  you want to make before Mr. Klinefeldt calls Mr. Wendt?

25          MR. LEEMKUIL:  No, Your Honor.

1          THE COURT:  All right.  Mr. Klinefeldt, how about you?

2    Is there any other record that you believe is appropriate to

3    make?

4          MR. KLINEFELDT:  No, Your Honor.

5          THE COURT:  All right.  With that then, Mr. Wendt, why

6    don't you come on up.  The courtroom deputy will swear you in,

7    and then you can take the witness stand.

8          THE CLERK:  Please raise your right hand.

9            BRADLEY WENDT, DEFENSE WITNESS, SWORN

10          THE CLERK:  Thank you.  You can be seated.

11          THE COURT:  When you're ready, Mr. Klinefeldt, you may

12    proceed.

13          MR. KLINEFELDT:  Thank you, Your Honor.

14                      DIRECT EXAMINATION

15    BY MR. KLINEFELDT:

16    Q.  Mr. Wendt, can you please state and spell your name for the

17    record.

18    A.  Bradley Eugene Wendt, B-r-a-d-l-e-y E-u-g-e-n-e W-e-n-d-t.

19    Q.  Thank you, Mr. Wendt.

20          Mr. Wendt are you employed by the City of Adair?

21    A.  Yes.

22    Q.  How so?

23    A.  Chief of police.

24    Q.  Do you remember August 31st --

25    A.  Yes.

BRADLEY WENDT - DIRECT

60

1  Q.  -- 2022?

2  A.  Yes.

3  Q.  On that day, did the ATF and FBI show up at the police

4  station?

5  A.  Yes.

6  Q.  How did that come about?

7  A.  Several days before I received a call from dispatch asking

8  me to call one of the agents and set up a meeting.  I called

9  that agent, and he said he wanted to brief me on another case

10  and set up a time to meet on.  It was -- he suggested the time

11  and date.

12  Q.  And so was it the FBI agent who picked the time and date of

13  the meeting that ultimately occurred?

14  A.  Yes, sir.

15  Q.  And was that on August 31st, 2022?

16  A.  Yes, sir.

17  Q.  And the city council was meeting that day; is that correct?

18  A.  Yes.

19  Q.  At some point on that day, did you become aware that you

20  were under a federal criminal investigation?

21  A.  Yes.

22  Q.  And at some point on August 31st or after, did the City of

23  Adair begin asking you questions about that?

24  A.  Yes.

25  Q.  Did you answer them?

BRADLEY WENDT - DIRECT

61

```
 1   A.   Yes.

 2   Q.   Why?

 3   A.   They were my boss, and I just feel obligated to answer the

 4   questions.

 5   Q.   And in addition to them being your boss, you're the police

 6   chief; is that correct?

 7   A.   Yes.

 8   Q.   And you have an obligation and a duty to answer questions of

 9   the mayor and city council concerning police matters; is that

10   correct?

11   A.   Yes.

12   Q.   Did you do that?

13   A.   Yes, I did.

14   Q.   On or about October 3rd, 2022, did you receive a letter from

15   the City?

16   A.   I believe so.  I'm not sure of the dates exactly but . . .

17   Q.   Was that Exhibit X?  I can --

18              MR. KLINEFELDT:  May I approach, Your Honor?

19              THE COURT:  You may.

20   Q.   Do you recall receiving that letter?

21   A.   Yes, sir.

22   Q.   Was that on about -- on or about October 3rd?

23   A.   Yes.

24   Q.   And was the person who delivered that to you the city

25   attorney, Clint Fichter?
```

BRADLEY WENDT - CROSS

1  A.  Yes.  It was e-mailed to me.

2  Q.  What did that letter say about responding to questions?

3  A.  The way I took it is if I didn't respond to it, it would

4  pretty much mean I was terminated.

5  Q.  Was this, your impression that you were obligated to answer

6  questions, in response to this letter?

7  A.  Yes.

8  Q.  And what was your belief about what would happen if you did

9  not?

10  A.  I believed I would be terminated.

11  Q.  Regardless of what the consequence would be, what was your

12  belief regarding whether those statements could be used against

13  you in a criminal proceeding?

14  A.  It says they would not be but . . .

15  Q.  And so that's -- that's what the City told you; correct?

16  A.  Correct.

17          MR. KLINEFELDT:  No further questions, Your Honor.

18          THE COURT:  Mr. Leemkuil, cross-examination?

19          MR. LEEMKUIL:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21  BY MR. LEEMKUIL:

22  Q.  Mr. Wendt, you were just asked some questions about

23  Exhibit X, which was a letter that was e-mailed to you by the

24  city attorney; correct?

25  A.  Yes.

1  Q.  And I believe your testimony was that upon reviewing that

2  letter, you thought that if you didn't answer the questions, you

3  would be fired; is that fair?

4  A.  Yes.

5  Q.  What about this letter made you think that?

6  A.  Well, the second page, the last line.

7  Q.  Can you go ahead and read that sentence?

8  A.  Please be advised that this investigation may result in

9  reprimand or termination of your employment.

10 Q.  You would agree that that doesn't say a failure to answer

11 questions would result in a termination of your employment;

12 right?

13 A.  It does not say that.

14 Q.  And I wanted to direct you to the fourth paragraph of the

15 letter.  It begins, We are offering -- would you go ahead and

16 read that sentence, please?

17 A.  We are offering you an opportunity to respond to questions

18 regarding these purchases -- these purchases in writing or

19 through an in-person interview.  You may have an attorney

20 provide your responses or attend such meeting or in-person

21 interview.

22 Q.  And then I want to direct your attention to a paragraph

23 below the numbered list there.  It begins with "you may also

24 provide."  Can you go ahead and read that sentence, please?

25 A.  You may also provide any other information that you feel is

1  pertinent to this situation.

2  Q.  Mr. Wendt, did the mayor ever tell you that you would be

3  fired if you didn't answer questions or speak to the city

4  council?

5  A.  No.

6  Q.  Did any member of the city council ever tell you that you'd

7  be fired if you did not speak or answer questions to the city

8  council?

9  A.  No.

10            MR. LEEMKUIL:  Nothing further, Your Honor.

11            THE COURT:  Mr. Klinefeldt, redirect?

12            MR. KLINEFELDT:  Thank you, Your Honor.

13                      REDIRECT EXAMINATION

14  BY MR. KLINEFELDT:

15  Q.  So on August 31st, the FBI and ATF come and execute a search

16  warrant on the city hall; is that correct?

17  A.  Yes, sir.

18  Q.  They take a firearm out of the police vehicle; is that

19  correct?

20  A.  Yes, sir.

21  Q.  What was your impression of the seriousness of this matter?

22  A.  I've been in law enforcement for over 20 years, and I've

23  never seen that happen or anything remotely close to what

24  happened in this situation.

25  Q.  And regardless of your belief about whether you had done

1  anything wrong, was it your belief that you could be terminated?

2  A.  Absolutely.

3  Q.  Now, we've talked before about the obligation to answer

4  questions.  Does the City have the authority to request

5  information from you?

6  A.  Yes.

7  Q.  As an employee; correct?

8  A.  Yes.

9  Q.  As police chief; correct?

10  A.  Yes.

11  Q.  And, in fact, it's City policy that you have to answer those

12  questions; is that correct?

13  A.  Yes.

14  Q.  Nobody has to tell you that you have to answer their

15  questions; is that fair?

16  A.  Yes.

17  Q.  In fact, is there any difference in your mind between

18  somebody who has the authority to require information and then

19  request it of you and somebody who just, you know, has the

20  authority and directs you to give it?  Is there any difference?

21  A.  No.

22          MR. KLINEFELDT:  No further questions, Your Honor.

23          THE COURT:  Mr. Leemkuil, follow-up to that?

24          MR. LEEMKUIL:  Nothing further, Your Honor.

25          THE COURT:  All right, Mr. Wendt.  You're excused.

1        ***End of transcript excerpt***

2                C E R T I F I C A T E
         I, Tonya R. Gerke, a Certified Shorthand Reporter of
3   the State of Iowa and Federal Official Realtime Court Reporter
    in and for the United States District Court for the Southern
4   District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
    Section 753, that the foregoing is a true and correct transcript
5   of the stenographically reported proceedings held in the
    above-entitled matter and that the transcript page format is in
6   conformance with the regulations of the Judicial Conference of
    the United States.
7            Dated at Des Moines, Iowa, July 5, 2023.

8

9                /s/ Tonya R. Gerke
                 Tonya R. Gerke, CSR, RDR, CRR
10               Federal Official Court Reporter

11

12                      INDEX

13  WITNESS                                            PAGE

14     **CLINTON FICHTER,** DEFENSE WITNESS              2

15   DIRECT EXAMINATION BY MR. KLINEFELDT               2

16   CROSS-EXAMINATION BY MR. LEEMKUIL                  52

17   REDIRECT EXAMINATION BY MR. KLINEFELDT             54

18   RECROSS-EXAMINATION BY MR. LEEMKUIL                55

19     **BRADLEY WENDT,** DEFENSE WITNESS                59

20   DIRECT EXAMINATION BY MR. KLINEFELDT               59

21   CROSS-EXAMINATION BY MR. LEEMKUIL                  62

22   REDIRECT EXAMINATION BY MR. KLINEFELDT             64

23

24

25