IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRADLEY EUGENE WENDT,<br><br>Defendant. | 4:22-cr-00199-SHL-HCA-1<br><br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL** |

## I.      INTRODUCTION.

After a seven-day trial, a jury found Defendant Bradley Eugene Wendt guilty of eleven offenses and not guilty of four others relating to the alleged misuse of his position as Police Chief for the City of Adair, Iowa, to acquire and possess highly regulated machine guns. Wendt moves for judgment of acquittal and/or new trial based on alleged errors in the jury instructions, the "unconstitutionally vague" nature of the charges, and sufficiency of the evidence. The Court concludes: (i) the jury instructions accurately summarized the law; (ii) the charges were not impermissibly vague; and (iii) the evidence sufficiently supports the jury's verdict on each of the eleven counts for which Wendt was found guilty. The Court therefore DENIES Wendt's Motion for Judgment of Acquittal and/or New Trial.

## II.     BACKGROUND.

### A.  Legal and Regulatory Background for the Possession and Transfer of Machine Guns.

To understand the facts, it is first necessary to understand the legal and regulatory framework for the ownership, possession, and transfer of machine guns. Under federal law, it is illegal to possess and/or transport machine guns manufactured after May 19, 1986. There is, however, an exception for "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o)(2)(A). Congress delegated authority to the Attorney General to promulgate rules and regulations regarding the enforcement of section 922(o) and related laws. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 146 (3d Cir. 2022); *see also* 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). The Attorney General subdelegated this authority to the ATF Director. *See Whitaker*, 42 F.4th at 146, n.2.

Pursuant to its delegated authority, and as relevant here, ATF has promulgated rules regarding the "procedural and substantive requirements relative to the importation, manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 C.F.R. § 479.1. These rules include requirements that must be satisfied before ATF will approve the transfer or possession of a machine gun. 27 C.F.R. § 479.105. Two types of permissible transfers of machine guns are relevant here: (i) "the sale or distribution of such weapons for the official use of Federal, State or Local governmental entities," *id.* § 479.105(c); and (ii) the transfer of machine guns to authorized dealers when "it is established by specific information [from the machine gun dealer] the expected governmental customers who would require a demonstration of the weapon, information as to the availability of the machine gun to fill subsequent orders, and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon," *id.* § 479.105(d). At trial, the Government used the phrase "purchase law letter" to describe the paperwork that is typically provided to ATF in connection with the first type of transfer and "demonstration law letter" to describe the paperwork that must be provided to ATF in connection with the second type of transfer.

A "purchase law letter" is prepared by an appropriate official with a government agency (such as a police department) regarding the quantity, make, and model of the machine gun the agency seeks to purchase. The purchase law letter often states that the machine gun is being acquired "for the agency's official use and not for the purpose of resale or transfer," or words to similar effect. If the transaction is authorized and consummated, the government agency becomes the registered owner of the machine gun.

The "demonstration law letter" is designed to give a government agency the opportunity to test a machine gun without necessarily buying it. The demonstration law letter is written by an appropriate government official to a Federal Firearms Licensee with a Special Occupancy Tax license (an "FFL-SOT"); i.e., an entity authorized to possess machine guns. The demonstration law letter typically states that the agency has an interest in seeing a demonstration of a particular machine gun for possible future purchase. The FFL-SOT then submits that letter to ATF as part of an application to acquire a machine gun. If the transaction is authorized and consummated, the FFL-SOT becomes the registered owner of the machine gun. The government agency may—but is not required to—end up purchasing the machine gun from the FFL-SOT. If the government

agency chooses not to do so, the FFL-SOT retains ownership of the machine gun and may sell or transfer it subject to certain restrictions.

    *B.  Summary of Evidence.*[1]

    At all relevant times, Wendt was a certified law enforcement officer in the State of Iowa and worked full-time for the City of Adair, Iowa. He also owned and operated a gun store, known as BW Outfitters, that held an FFL-SOT license. At some point in 2018, Wendt spoke with City officials in Adair about being given the title of Police Chief. It is unclear whether Wendt approached City officials about the title or if the officials approached him; regardless, he was named Police Chief in mid-2018. As a political subdivision of the State of Iowa, the City of Adair can lawfully acquire and possess machine guns pursuant to 18 U.S.C. § 922(o)(2)(A).

    The Police Chief title meant Wendt could write purchase law letters and/or demonstration law letters to try to satisfy ATF regulatory requirements for the transfer of machine guns. Wendt did so on dozens of occasions between 2018 and 2022, with some of those letters serving as the basis for charges in the Indictment for making false statements. In all, Wendt was charged with one count of conspiracy to make false statements to ATF and/or defraud ATF (Count 1); two counts of making false statements to ATF in purchase law letters (Counts 2 and 3); eleven counts of making false statements to ATF in demonstration law letters (Counts 4 through 14); and one count of unlawful possession of a machine gun (Count 15).[2] The Government's overarching theory was that Wendt wrote law letters not because the City of Adair was interested in purchasing machine guns, but rather to enrich himself by stockpiling machine guns that he eventually intended to resell or to help third parties do the same.

    Some of Wendt's earliest demonstration law letters were written in October 2018 and January 2019 to Marcum MFG LLC, a gun dealership in Indiana owned by Jonathan Marcum. On October 31, 2018, Wendt wrote demonstration law letters to Marcum expressing the City of Adair's putative interest in the demonstration of six Heckler & Koch ("H&K") machine guns (Count 4) and eleven FN machine guns (Count 5). (*See* ECF 348-63 through 348-69 ("Govt. Exs. 204–210").) On January 15, 2019, Wendt wrote another demonstration law letter to Marcum expressing

---

[1] Neither side ordered the trial transcript, so the Court is relying primarily on the exhibits and its own recollection of testimony. It does not appear, in any event, that there is a dispute about most of the underlying facts; instead, the case boils down to Wendt's intent.

[2] The Indictment charged Wendt with twenty counts, but the Government dismissed five of them before trial. The Court renumbered the remaining fifteen counts for trial so there would not be gaps in the numbering. All references in this Order are to the renumbered counts at trial.

the City's putative interest in the demonstration of four more H&K machine guns and two SIG machine guns (Count 6). (*See* ECF 348-71 and 348-72 ("Govt. Exs. 212–213").) Each of these demonstration law letters stated that "Adair Police Department is requesting a firearms demonstration by Marcum MFG LLC. This demonstration will evaluate the firearms listed below for possible purchase for official duties for our department . . . The number of sworn certified officers in our department is 6 . . . The firearm requested for demonstration is particularly suitable for use for government agencies." (*See, e.g.*, Govt. Ex. 211, p. 1.)

At trial, Marcum testified that he had an agreement with Wendt in which Marcum's business would use the demonstration law letters to obtain ATF approval to acquire the machine guns, which Marcum intended to then turn around and resell for a profit. Marcum said he and Wendt agreed the profits would be shared between Marcum's business and the City of Adair. Marcum testified that although the machine guns were obtained via demonstration law letters, they were never actually "demonstrated" to anyone. In other words, and by way of example, no one from Adair ever traveled to Indiana (or vice versa) to test the machine guns, nor was any other sort of demonstration ever performed. Marcum testified that he did not intend to break the law in his interactions with Wendt and did not believe Wendt intended to break the law, either. Still, Marcum pled guilty to charges in a separate case relating to misuse of demonstration law letters. The jury ultimately found Wendt not guilty on Counts 4 and 5 but guilty on Count 6. The jury also found Wendt guilty in Count 1 of conspiring with Marcum to make false statements to ATF.

In addition to the letters he wrote for Marcum, Wendt wrote many other demonstration law letters and purchase law letters between 2018 and 2022, often to his own gun business, BW Outfitters. In total, between 2018 and 2022, Wendt wrote purchase law letters and demonstration law letters expressing the three-person Adair Police Department's putative interest in more than fifty machine guns. The Government presented evidence at trial indicating that Wendt did not believe the City of Adair was genuinely interested in these guns, but rather that Wendt was simply using the law letters as a ruse to acquire machine guns—and, ultimately, make money—for himself and his gun business or third parties. For example, Wendt was involved in the following Facebook communications:

- <u>January 21, 2019</u>: Wendt sent a message to Noah Schilling saying, "Machine guns are worth bank money. Paid 4k for mp5sd[3] can sell for 20k." (ECF 349-4, p. 1 ("Govt. Ex. 401").) He also wrote: "I'm building machine gun arsenal"

---

[3] An "MP5SD" is a model of machine gun manufactured by H&K.

and "This chief police jig is awesome . . . Send machine guns to my own gun store lol . . . Just need the title." (ECF 349-6, p. 1 ("Govt. Ex. 402").)

- February 26, 2019: alleged co-conspirator Rob Williams sent Wendt a message saying, "Figuring out how to get rich yet?" (Govt. Ex. 401, p. 2.) Wendt responded: "Oh ya just bought 2 more mp5sd," followed by a picture of a machine gun. (Id.; ECF 349-5 ("Govt. Ex. 401A").)

- March 8, 2019: Wendt sent messages to Mike Bremser saying, "Find someone wanting my extra mp5sd . . . 7k I'll write demo letter." (Govt. Ex. 401, p. 2.)

- April 18, 2019: Wendt sent messages to Matthew Stringham indicating he was "bored" by his job in Adair but "chief status let's me sign for machine guns for my indoor range. Win win." (Govt. Ex. 402, p. 1.)

- August 20, 2020: Wendt sent a message to Neal Cooley saying that he would quit his job in Adair if he was named Police Chief in Lakeview, Iowa, but otherwise would keep the Adair job. Wendt said: "Gotta be chief tho for machine guns so we'll see." (Id., p. 2.)

- October 8, 2020: Wendt sent a message to Matt Nicholson indicating he would write a demonstration law letter for Nicholson "but I wanna quit so wanna get it done i[n] next 6 months. I'm about done at PD too tired 100 hr weeks suck . . . I want mini[4] tho lol." (Id.)

- September 26, 2021: Wendt sent a message to Corey Soriano asking whether Soriano had any machine guns. Soriano responded, "We can make them, you gotta know someone with power in LE office." Wendt replied: "Lol I'm chief of police bitch . . . I have about 50 already need more . . . I love full autos." (Id., p. 3.)

- February 1, 2022: Wendt sent a message to Don Powless saying, "I retire in December . . . Glad I got year left buying many machine guns as I can bailing." (Id.)

Wendt wrote additional demonstration law letters throughout this period beyond those to Marcum, including the following letters that correspond to individual charges in the Indictment:

- Count 7: demonstration law letter dated March 28, 2019[5], to BW Outfitters stating:

  > The Adair Police Department would like a demonstration of the M-249 Para 5.56 Machine Gun for possible future purchase and use of our officers in the performance of their official duties . . . The firearm requested for demonstration is particularly suitable for use as a law enforcement weapon. The M-249 Para 5.56 Machine Gun is suitable for close quarters engagements and suppressive fire which is

---

[4] In context, a reasonable juror could—and almost certainly *would*—have interpreted the word "mini" as a reference to a high-powered machine gun known as a "minigun," which is at issue in Count 10.

[5] Wendt originally requested a demonstration of the M-249 Para 5.56 gun on July 19, 2018, but the ATF denied the request, so he sent another letter on March 28, 2019. (Govt. Ex. 213.)

> important in dealing with well armed suspects which agencies are faced with more and more each day.

(Govt. Ex. 213, p. 4.)

- <u>Count 8</u>: demonstration law letter dated July 19, 2020, to BW Outfitters stating:

> I am writing to request a formal demonstration of the M2 HB-QCB, 12.7mmx99mm (Full Auto) Machinegun, manufactured by FNH USA LLC to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department in special operations and patrol, based on its price and availability.

(ECF 348-84, p. 1 ("Govt. Ex. 225").)

- <u>Count 9</u>: demonstration law letter dated January 18, 2021, to Arms Unlimited, Inc., Las Vegas, Nevada, stating:

> The Adair Police Department is requesting a demonstration of the following select-fire/automatic weapon(s) for possible future purchases and use of our officers in the performance of their official duties . . . The firearms requested for demonstration are particularly suitable for use as law enforcement weapon. The weapon requested are particularly suitable for our officers while conducting special operations and high-risk prisoner transportation details. This demonstration is requested for the entire Adair Police Department. Each officer will have an opportunity to fire the weapon(s) which will require the machine guns to fire thousands of rounds. This type of testing during the demonstration will show the reliability of the firearm to the department.

(ECF 348-94, p. 1 ("Govt. Ex. 235").)

- <u>Count 10</u>: demonstration law letter dated November 29, 2021, to BW Outfitters stating:

> The Adair Police Department would like a demonstration of the GAU-2b/A Machine Gun manufactured by DeGroat Tactical Armaments for possible future purchase and use of our Officers in the performance of their official duties . . . The firearm requested for the demonstration is particularly suitable for use as a law enforcement weapon. The GAU-2B/A 7.62mm Machine Gun is suitable for engagements and suppressive fire which is important in dealing with well

6

> armed suspects which agencies are faced with more and more each day.

(ECF 348-108, p. 1 ("Govt. Ex. 249").)

- <u>Count 11</u>: demonstration law letter dated March 1, 2022, to TM Firearms LLC stating:

> I am writing to request a formal demonstration of the MP5SD3 (Full Auto) 9mm Machinegun, manufactured by Heckler and Koch to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies.

(ECF 348-73, p. 4 ("Govt. Ex. 214").)

- <u>Count 12</u>: demonstration law letter dated March 1, 2022, to TM Firearms LLC stating:

> I am writing to request a formal demonstration of the MP7A2 (Full Auto) 4.6x30mm Machinegun, manufactured by Heckler and Koch to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies.

(ECF 348-82, p. 11 ("Govt. Ex. 223").)

- <u>Count 13</u>: demonstration law letter dated July 1, 2022, to Palm Beach Shooting Organization LLC stating:

> I am writing to request a formal demonstration of the G36C (Full Auto) 5.56 Machinegun, manufactured by Heckler & Koch to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies.

(ECF 348-112, p. 1 ("Govt. Ex. 253").)

- Count 14: demonstration law letter dated August 28, 2021, to Williams Contracting LLC stating:

> I am writing to request a formal demonstration of the IO INC Model: Sporter Caliber: 7.62X39 Manufacturer: Grain Sporting Goods LLC/GRAIN SG to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies.

(ECF 348-106, p. 1 ("Govt. Ex. 247").)

The jury found Wendt guilty of making false statements in demonstration law letters as charged in Counts 6 and 8 through 14 but not guilty of making false statements in demonstration law letters as charged in Counts 4, 5, and 7.

In addition to charges arising out of demonstration law letters, the Indictment charged Wendt with two counts (Counts 2 and 3) relating to purchase law letters that were used to acquire machine guns. Count 2 was based on a purchase law letter dated October 9, 2019, for five machine guns: three H&K MP7A2s, one H&K G36k, and one H&K 416. (*See* ECF 348-80 ("Govt. Ex. 221").) The purchase law letter was signed by Wendt and stated, in part: "These firearms will be the property of our Adair Police Department and are not being acquired for the purpose of resale or transfer, They will be used to carry out its official responsibilities and duties." (Id., p. 1.) Count 3 was based on a purchase law letter dated March 3, 2022, for three MP7A2 machine guns. (*See* ECF 348-110 ("Govt. Ex. 251").) The purchase law letter was again signed by Wendt and stated, in part: "These firearms will be the property of our Adair Police Department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties." (Id., p. 1.) The jury found Wendt not guilty of making false statements as charged in Count 2 but guilty of making false statements as charged in Count 3.

The machine guns at issue in Counts 2 and 3 were not the only machine guns purportedly acquired by the City of Adair during the relevant period. On August 19, 2021, Wendt submitted a letter to Arms Unlimited on City of Adair letterhead for the purchase of an M60E6 US Ordnance 33235 M60 E6 7.62 machine gun "for Adair Police Department, in Adair, Iowa." (ECF 348-105, p. 1 ("Govt. Ex. 246").) ATF authorized the transaction, and Arms Unlimited shipped the gun. (Id.,

pp. 2–7.) On April 16, 2022, members of the public were allowed to shoot the US Ordnance M60 E6 machine gun at a public event in Woodbine, Iowa, sponsored by BW Outfitters. Woodbine is more than fifty miles away from the City of Adair, and there was no signage at the event suggesting it was sponsored or hosted by the Adair Police Department. Moreover, Wendt advertised the machine gun shoot on his personal Facebook page, (ECF 349-10 ("Govt. Ex. 406")), and did not wear his police uniform at the event. In fact, Adair records show that he was off duty on the date and time of the event. Count 15 of the Indictment charged Wendt with unlawful possession of a machine gun at that event.

Despite being off duty, out of uniform, and more than fifty miles away from the City of Adair, Wendt argued that he possessed the machine gun at issue in Count 15 in connection with his "official duties" as Adair Police Chief. To support this defense, he presented evidence from several witnesses, including an elected official, about the value they derived from having the opportunity to shoot machine guns. Wendt successfully requested a jury instruction informing the jury that "[o]fficers of a municipal police department in the State of Iowa may perform their official duties outside of the city they serve." (ECF 330, Final Instruction No. 26.) Wendt also successfully requested a jury instruction informing the jury that "[a]n employee or agent of a governmental entity is authorized by that entity to possess a machine gun so long as his or her possession is within the scope of his or her official duties." (Id., Final Instruction No. 29.) The instruction further stated, in part: "To determine whether the defendant had the authority, or reasonably believed he had the authority, to possess the machine gun, you must consider whether his possession on the date in question was within the scope of his official duties as an officer of the Adair Police Department." (Id.) The jury found Wendt guilty of unlawful possession as charged in Count 15.

## III.   LEGAL STANDARDS.

Pursuant to Fed. R. Crim. P. 29(a), the Court must grant a motion for judgment of acquittal if "the evidence is insufficient to sustain a conviction." "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Gonzalez*, 826 F.3d 1122, 1126 (8th Cir. 2016). The Court must view the evidence in the light most favorable to the verdict and accept all reasonable inferences supported by the evidence. *Id.* The Court may not assess the credibility of witnesses. *See United States v. Lemoine*, --- F.4th ----, 2024 WL 2968075, at *3 (8th Cir. June 13, 2024). The Rule 29(a) standard "is very strict, and the jury's verdict is not to be lightly

overturned." *United States v. Wright*, 993 F.3d 1054, 1065 (8th Cir. 2021). This is particularly true where the jury rendered a split verdict. *See Lemoine*, 2024 WL 2968075, at *3 (split verdicts are "significant" because they indicate "the jury carefully performed its duty by not simply rendering a blanket verdict on all counts").

The Court has more discretion when ruling on a motion for new trial and may grant such a motion "if the interest of justice so requires." Fed. R. Crim. P. 33(a). All the same, "[m]otions for new trial are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred." *United States v. Rice*, 449 F.3d 887, 893 (8th Cir. 2006) (cleaned up). The Court should exercise its authority to grant a new trial "sparingly and with caution." *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009).

## IV.    LEGAL ANALYSIS: MOTION FOR JUDGMENT OF ACQUITTAL.

### A.    *Pretrial Issues.*

Wendt's brief devotes several pages to arguing the Government violated his constitutional rights in the investigation and prosecution of the case. (ECF 353-1, pp. 11–13.)[6] It is unclear how, if at all, these arguments are relevant to Wendt's Motion for Judgment of Acquittal and/or New Trial; at most, Wendt simply seems to be reiterating pretrial arguments that the Court has already rejected. The Court stands by its prior rulings holding that: (a) the Government did not violate Wendt's constitutional rights when it obtained search warrants for his email and social media accounts (ECF 194); (b) although the Government violated Wendt's rights by listening to statements made by him to the Adair City Council under promise of immunity, the violation was harmless beyond a reasonable doubt (ECF 262); and (c) the Government did not violate Wendt's Fifth Amendment rights in the discovery process (ECF 194). Nothing at trial changes these rulings.

### B.    *Jury Instructions and Vagueness.*

### 1.    The Court Properly Instructed the Jury that the Adair Police Department Could Acquire and Possess Machine Guns Only "for Official Use."

As it relates to trial issues, Wendt starts by arguing that the Court erroneously instructed the jury in Final Instruction Nos. 26 and 29 that a government agency could lawfully possess machine guns only for "official use." Wendt asserts that the words "official use" are not found in 18 U.S.C. § 922(o), which instead allows post-1986 machine guns to be "transfer[red] to or by, or

---

[6] All citations are to the page number in the upper-righthand corner of each page, as auto-populated by the Electronic Case Filing (ECF) system. These page numbers are often different than the numbers placed on the bottom of each page by the parties.

possess[ed] by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." Given this statutory language, Wendt argues that it was improper to tell the jury the Adair Police Department could only possess machine guns for "official use."

The Court cannot tell whether Wendt intends for his "official use" argument to apply to all charges against him, or just the unlawful possession charge (Count 15). Wendt admits in one place that a police department "may only have [machine] guns transferred to it for its official use. . . ." (ECF 353-1, p. 16), thus suggesting the latter. Elsewhere, however, he shifts to arguing that the words "official use" should not have been included in jury instructions relating to the purchase law letters (id., pp. 18–22), which indicates the former. The Court will assume, in an abundance of caution, that Wendt's "official use" argument is directed to all eleven counts of conviction. For several reasons, the argument is unpersuasive.

First, as a matter of statutory interpretation, the fact that section 922(o)(2)(A) does not include the words "official use" does not mean that Congress did not intend to impose such a requirement on government agency possession of machine guns. In section 922(o), Congress established the general rule that the possession of post-1986 machine guns is unlawful. Section 922(o)(2)(A) is a limited exception to that general rule: it allows possession of such machine guns "by or under the authority of . . . [a] political subdivision." In context—and, again, keeping in mind the general rule prohibiting possession of machine guns—it seems clear that Congress wanted to limit possession to "federal or state agents acting in an official capacity." *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir. 1993); *see also United States v. Neuner*, 535 F. App'x 373, 374 n.1 (5th Cir. 2013) ("Clear statutory language and Congressional intent limit lawful transfer and possession of machine guns to authorized governmental personnel for use in their official capacities."); *United States v. Bascue*, 97 F.3d 1461, 1996 WL 554488, at *2 (9th Cir. 1996) (unpublished table decision) ("Section 922(o)'s exemption for transfers to a government agency is intended to exempt from liability the purchase of machineguns by law enforcement officers and other government agencies for law enforcement uses.").

Holding otherwise would give the words "under the authority of" an unnatural reading. Typically, when analyzing whether a government official or agency has the "authority" to do something, it is implicitly understood that there must be a connection between the action in question and the person's or agency's official duties or responsibilities. *Cf. West v. Atkins*, 487 U.S.

11

42, 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Indeed, Black's Law Dictionary uses the word "official" in each definition of "authority" that is potentially relevant here. *See Authority*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("**Authority.** 1. The official right or permission to act . . . 2. The power a person has through an official position . . . 3. An official organization or government department with particular responsibilities and decision-making powers."). Surely Congress intended to use the word "authority" in the typical fashion in section 922(o); i.e., to allow possession of a machine gun by a government agency only for "official" purposes.

Second, to the extent the words "by or under the authority of" are ambiguous as used in section 922(o)(2)(A), the ambiguity is properly resolved by governing regulations. 27 C.F.R. § 479.105(c) states: "The registration of such machine guns . . . and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons **for the official use** of Federal, State or local government entities" (emphasis added). Wendt has not cited any cases holding that ATF exceeded its statutory authority in enacting this regulation, nor is the Court aware of any such case law. Meanwhile, in analogous circumstances, the Eighth Circuit has affirmed the use of jury instructions that summarize federal firearms regulations. *See United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) (affirming use of jury instruction that "track[ed]" federal firearms regulations), *cert. granted, judgment vacated on other grounds*, 543 U.S. 1099 (2005), *and opinion reinstated*, 414 F.3d 942 (8th Cir. 2005); *see also United States v. Stupka*, 418 F. Supp. 3d 402, 414 (N.D. Iowa 2019) (recognizing that the Eighth Circuit model jury instructions are based on federal regulations in connection with the offense of unlawful user in possession of firearm). *Cf. United States v. French*, 683 F.2d 1189, 1195 (8th Cir. 1982) (affirming conviction in case where jury instructions summarized federal regulations).

Third, Wendt's "official use" argument misunderstands the crime of making a false statement under 18 U.S.C. § 1001. "By its terms, 18 U.S.C. § 1001 covers 'any' false statement—that is, a false statement 'of whatever kind.'" *Brogan v. United States*, 522 U.S. 398, 400 (1998) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). This means a person can violate section 1001 even if the statement in question is not "legally required." *United States v. Arcadipane*, 41 F.3d 1, 5 (1st Cir. 1994) ("[Section 1001] forbids falsification of any . . . statement, whether or not legally required, made to a federal agency."); *United States v. Puente*, 982 F.2d 156, 159 (5th Cir.

1993) (affirming conviction for making a false statement in a contract bid even though a true statement would not disqualify the bidder from obtaining the contract); *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984) ("That a statement was not required to be made to the agency does not make the statement any less material."). In other words, the relevant question in a prosecution for making false statements is not whether the statement is per se required to satisfy the relevant statute, but rather whether the statement "has a natural tendency to influence, or is capable of influencing, the decision of the decision making body to which it was addressed." *United States v. Robinson*, 809 F.3d 991, 999 (8th Cir. 2016) (cleaned up).

Here, by statute, ATF approval is required before post-1986 machine guns transactions may be consummated.[7] Consistent with its statutory authority, ATF has taken the position that whether an agency is acquiring a machine gun for "official use" is material to whether the transaction should be approved. There is ample justification for ATF to have adopted this approach. If an agency is not willing to certify that a machine gun is being acquired for "official use," it calls into question whether the agency is really the intended acquiror of the machine gun at all, or if (as the Government essentially alleged here) the agency is merely being used as a "puppet" to allow a private citizen or business to acquire machine guns for the citizen's or business's own enrichment. Similarly, even if the agency truly is acquiring the machine gun, the fact that it is doing so for some reason other than "official use" still might be material to ATF's decision to approve the transaction, as ATF might be concerned about allowing too many machine guns into circulation given Congress's decision to make possession of machine guns generally illegal. The point is that a statement about "official use" can be material to ATF's approval decision even if section 922(o) does not per se forbid the possession of a machine gun by a government agency for reasons other than "official use."

To that end, it is important to note that the jury instructions informed the jury that a false statement charge must be evaluated according to Wendt's intent *at the time the statement was made*. (ECF 330, Final Instruction Nos. 16–17.) Thus, it is irrelevant whether an agency eventually might decide to possess a machine gun for reasons other than "official use," or whether such eventual possession might be unlawful. The crucial question is instead whether Wendt made false

---

[7] 26 U.S.C. § 5812 requires the transferor of a post-1986 machine gun to obtain approval from "the Secretary" before the transaction may be consummated. "The Secretary" means "the Attorney General." 26 U.S.C. § 7801(a)(2)(A). The Attorney General delegated approval authority to the ATF Director. *Kajmowicz*, 42 F.4th at 146, n.2.

statements when he signed demonstration or purchase law letters stating that the City of Adair was interested in the actual or potential purchase of machine guns. The jury was accurately instructed on the elements of the charge of making false statements for purposes of Counts 1, 3, 6, and 8 through 14. The inclusion of language about "official use" in Final Instruction Nos. 26 or 29 does not undermine the jury's verdict on these counts.

This leaves only Count 15, which charged Illegal Possession of a Machine Gun, as being potentially affected by Wendt's argument about "official use." Wendt does not persuasively explain, however, why his argument about "official use" is connected to what the jury had to decide on Count 15. Final Instruction No. 20 informed the jury that the relevant question in Count 15 was whether *Wendt* possessed the machine gun in question, not whether the *Adair Police Department* did. (ECF 330, Final Instruction No. 20.) In other words, the point of Count 15 was that Wendt was treating the machine gun in question as his personal property, rather than Adair Police Department property. Wendt clearly understood this at trial, with his defense to Count 15 focusing on the theory that his possession of the machine gun on the date in question was connected to his work as Police Chief. He emphasized, for example, that a police chief is "always on duty" and successfully asked for a jury instruction stating that "[o]fficers of a municipal police department in the State of Iowa may perform their official duties outside of the city they serve." (*Compare* id., p. 31 (Final Jury Instructions), *with* ECF 291, p. 12 (Wendt's Proposed Final Jury Instructions).) Wendt also presented testimony from witnesses, including an elected official, about the value they derived from having the opportunity to shoot machine guns.

Against this backdrop, the disputed issue on Count 15 was not whether a government agency can possess a machine gun for reasons other than "official use," but rather whether Wendt possessed the machine gun in connection with his "official duties" as Police Chief. These are different issues. As to the latter, the Government presented evidence that Wendt was off duty, out of uniform, and at an event sponsored by his private gun business at a site more than fifty miles from the City of Adair when he possessed the machine gun at issue in Count 15. This evidence was more than sufficient to sustain the jury's conclusion that Wendt possessed the machine gun in his personal capacity, and not as part of his official duties. The Court will not overturn the jury's verdict based on an irrelevant statutory interpretation argument about whether the City of Adair could have possessed the machine gun for reasons other than "official use."

14

2.   <u>The Court Properly Instructed the Jury on the Concept of Demonstration Law</u>
<u>Letters.</u>

Wendt next argues that the Court improperly instructed the jury about demonstration law letters, which are written by government agencies to gun dealers to express the agencies' interest in seeing a "demonstration" of a particular type of machine gun. *See* 27 C.F.R. § 479.105(d). The gun dealer then submits the demonstration law letter to ATF as part of an application for permission to acquire the machine gun in question. The purpose of demonstration law letters is to allow government agencies to test machine guns (via the gun dealer) without being obligated to purchase them. In Counts 6 and 8 through 14, the jury concluded that Wendt made false statements in demonstration law letters.

The premise of Wendt's argument is that section 922(o) "does not permit gun dealers to acquire machine guns for purposes of demonstrations." (ECF 353-1, p. 25.) With this premise in mind, he argues that a government agency's statement about wanting a machine gun for demonstration purposes can never be material because ATF has no authority to allow a gun dealer to acquire or possess a machine gun for demonstration purposes anyway. This is an ironic argument for Wendt to make; if accepted, it would mean that every machine gun his business obtained via demonstration law letter was acquired and possessed illegally. In essence, his position is that he was committing different crimes than the ones for which he was charged.

Like Wendt's other jury instruction arguments, this one fails, first, because ATF did not exceed its authority when it allowed gun dealers to obtain machine guns for demonstration purposes for government agencies. Section 922(o) permits the possession of a machine gun "under the authority of" a government agency. When a government agency has a legitimate interest in purchasing a machine gun—and communicates the same to a gun dealer through a demonstration law letter—the gun dealer who acquires the machine gun is doing so "under the authority of" the government agency and therefore is not violating section 922(o). It follows that: (i) ATF did not exceed its authority when it enacted 27 C.F.R. § 479.105(d); and (ii) the jury instructions accurately stated the law.

Wendt's argument also fails because a statement does not cease to be "material" simply because it convinces an agency like ATF to take action that (allegedly) violates the law; instead, if anything, such a statement is more material than normal. As the Eighth Circuit explained in *United States v. Voorhees*, a defendant who uses false statements to convince the government to do something illegal "cannot escape criminal liability by claiming that the agency [taking the action]

15

lacked authority to do so." 593 F.2d 346, 350 (8th Cir. 1979). Instead, in *Voorhees*, the materiality requirement was satisfied even though the government agency allegedly lacked the authority to make the payments the defendant convinced the agency to make. *Id.* ("Since Voorhees applied for and received such 'illegal' payments, he is not now in a position to assert that his false statement was not material because it was incapable of producing illegal payments.").

Similarly, in *United States v. Adler*, the defendant, a doctor, was convicted for making false statements to obtain reimbursement under Medicaid and Medicare programs for medical services the doctor did not actually perform. 623 F.2d 1287, 1291 (8th Cir. 1980). The defendant argued the false statements could not have been "material" because the services—whether performed or not—were not compensable under Medicaid or Medicare. *Id.* The Eighth Circuit disagreed, holding that the defendant's position, if adopted, "would remove the criminal fraud sanction from the most egregious cases of false claims . . . We do not think Congress intended such a result in enacting a sweeping prohibition on false and fraudulent statements under 18 U.S.C. § 1001." *Id.* *Adler* and *Voorhees* are controlling here and defeat Wendt's position as to materiality on Counts 6 and 8 through 14.

       3.  The Charges Are Not Unconstitutionally Vague.

Wendt next argues, in various places, that the charges against him are unconstitutionally vague. The Court disagrees. As it relates to Counts 1, 3, 6, and 8 through 14, two federal appellate courts have upheld convictions for similar conduct to that charged against Wendt, with the Sixth Circuit rejecting a void-for-vagueness challenge akin to the one Wendt appears to be raising here. *See United States v. Theunick*, 651 F.3d 578, 585–86 (6th Cir. 2011) (rejecting vagueness challenge); *see also United States v. Kelerchian*, 937 F.3d 895, 907–08 (7th Cir. 2019) (affirming conviction based on defendant's use of false statements in demonstration law letters).

Contrary to Wendt's argument, there is nothing ambiguous or vague—and certainly not to the level of constitutional infirmity—about the statutes and regulations governing the acquisition and transfer of machine guns. The principal statute is section 922(o), which makes it "unlawful for any person to transfer or possess a machine gun" but contains an exception for machine guns transferred to or possessed by the United States, a State, or a department, agency, or political subdivision thereof. Section 922(o) is buttressed by a separate statute prohibiting the transfer of machine guns unless a "written application" is filed with and approved by ATF. *See* 26 U.S.C. § 5812(a). "Applications shall be denied if the transfer, receipt, or possession of the firearm would

place the transferee in violation of law." *Id.* Federal regulations then flesh out the two permissible types of transfers of machine guns of relevance here: (i) the sale or distribution to federal, state, or local government agencies, 27 C.F.R. § 479.105(c); and (ii) the transfer of machine guns to authorized dealers for demonstration purposes when a government agency expresses interest in potential purchase, *id.* § 479.105(d).

Read collectively, the governing statutes and regulations are not ambiguous. As it pertains to purchase law letters, the applicant must submit a "written application," 26 U.S.C. § 5812(a), establishing that the machine gun is "for the official use of Federal, State or Local governmental entities," 27 C.F.R. § 479.105(c). This is a straightforward requirement designed to confirm that a local law enforcement agency intends to make "official use" of the weapon before the transfer is approved. Similarly, the demonstration law letter is part of the "written application," 26 U.S.C. § 5812(a), that must, among other things, confirm to ATF the existence of a law enforcement agency that is interested in a demonstration of the machine gun(s) for potential acquisition. Nothing in the governing statutes or regulations permits the acquisition of a machine gun for personal ownership, and thus the predominant issue in the Government's case against Wendt is the same as the one the Sixth Circuit identified in *United States v. Theunick*: "whether [Wendt] used the authority of [his] office[] as a pretext for the personal use of automatic weapons." 651 F.3d at 585; *see also Kelerchian*, 937 F.3d at 908 ("From the content of these letters, a reasonable jury could find that these were false requests for demonstrations. The letters could have had no other purpose."). There is no vagueness problem in these circumstances.

There is also no vagueness problem in Count 15, which charged Wendt with unlawful possession of a machine gun in connection with the event in Woodbine, Iowa. Wendt argues that his conviction on Count 15 is invalid under *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006), which held that section 922(o) was unconstitutionally vague as applied to a law enforcement officer in Illinois who ordered a machine gun while serving as a rifle instructor. *Id.* at 1004. *Vest* revolved around the law enforcement exception in section 922(o)(2)(A), which allows possession of a machine gun "by or under the authority of" a government agency. The defendant argued that he had "inherent authority" to legally possess the machine gun and that his supervisor authorized him to acquire it anyway. *Id.* The Government admitted that it had no evidence the defendant ever used the machine gun for anything other than law enforcement purposes but nonetheless charged him with violating section 922(o). *Id.*

17

*Vest* concluded the language of section 922(o)(2)(A) was unconstitutionally vague because a reasonable officer in the defendant's shoes would have no guidance as to when he was possessing the firearm legally versus illegally and whose "authority" was necessary to make the possession of the firearm lawful. *Id.* at 1010. *Vest* further concluded, based on legislative history, that "the law enforcement exception was included because § 922(o) was not intended to apply to police officers, but instead its purpose was to eliminate the use of machine guns and various other weapons used to commit crimes. It does not appear that this statute was designed to criminalize police officers even if they may be guilty of mere technical violations." *Id.* at 1011. *Vest* reached this conclusion after analyzing legislative debate and discussion in the United States Senate. *Id.* at 1010–11.

*Vest* is distinguishable because the officer in that case never possessed or used the machine gun for anything other than law enforcement purposes. Here, by contrast, the whole point of Count 15 is that, in the Government's view, Wendt had no legitimate law enforcement purpose when he took the machine gun to the BW Outfitters event in Woodbine. This case therefore does not revolve around who had the authority to allow Wendt to possess the machine gun in his official capacity as a law enforcement officer, but rather whether Wendt possessed the machine gun in his official capacity at all. *Vest* does not apply in these circumstances. *See United States v. Carn*, No. 213CR00346APGGWF, 2018 WL 1413971, at *1 (D. Nev. Mar. 20, 2018) (refusing to apply *Vest* to a situation in which the defendant "possessed the weapons for commercial or personal purposes, with no connection to law enforcement use"); *cf. Theunick*, 651 F.3d at 587 (holding that *Vest* did not apply to the "central issue, namely, whether the Defendants used the authority of their positions as a pretext for acquiring multiple machine guns for their personal use").

In arguing otherwise, Wendt essentially interprets *Vest* to mean a law enforcement officer never can be prosecuted under section 922(o) if the officer has at least some arguable basis for claiming authority to possess a machine gun. This is a reasonable interpretation of *Vest*, which, although purportedly only finding the statute to be unconstitutional as applied, effectively held that the words "by or under the authority of" as used in section 922(o)(2)(A) will be fatally ambiguous whenever applied to a police officer. 448 F. Supp. 2d at 1010. The problem for Wendt, however, is that the Eighth Circuit has interpreted the words "by or under the authority of" (or similar verbiage) in a variety of contexts without ever suggesting they are ambiguous at all, much less to the point of constitutional infirmity. For example, the Eighth Circuit has repeatedly decided identity theft cases arising under a federal statute that defines "identification documents" to mean documents

created "by or under the authority of" the federal or state government. *See* 18 U.S.C. § 1028(d)(3); *United States v. Rojas*, 826 F.3d 1126, 1130 (8th Cir. 2016); *United States v. Retana*, 641 F.3d 272, 275 (8th Cir. 2011). The Eighth Circuit has never had a problem interpreting those words or allowing the factfinder to decide whether a defendant possessed or used identification documents "without lawful authority." *See Rojas*, 826 F.3d at 1130 (affirming verdict); *Retana*, 641 F.3d at 275 (same). Similarly, the Eighth Circuit has had no apparent difficulty deciding when or how to apply the "public authority defense," which requires a defendant to show reasonable reliance on "the authority of a government official" to engage in what otherwise would be unlawful activity. *United States v. Xiong*, 914 F.3d 1154, 1160 (8th Cir. 2019); *United States v. Achter*, 52 F.3d 753, 755 (8th Cir. 1995).

There is nothing about section 922(o)(2)(A) that makes the words "by or under the authority of" more difficult to interpret than when those words (or similar words) are used in other contexts. On its face, section 922(o) unambiguously establishes a general rule that the possession of post-1986 machine guns is illegal. *See United States v. Just*, 74 F.3d 902, 904 (8th Cir. 1996). Section 922(o)(2)(A) creates an exception to the general rule, which the Eighth Circuit has treated as an affirmative defense. *See id.* Section 922(o)(2)(A) is therefore essentially a codification of the public authority defense, which, as noted above, the Eighth Circuit has not struggled to apply even though it revolves around whether a defendant's conduct was authorized by a government official. *See Xiong*, 914 F.3d at 1160; *Achter*, 52 F.3d at 755. The Court cannot reconcile *Vest*'s conclusion that the words "by or under the authority of" are fatally ambiguous with Eighth Circuit precedent expressing little to no difficulty in interpreting those words.

The Court also finds *Vest* unpersuasive for other reasons. *Vest* relied heavily on legislative history in deciding that the words "by or under the authority of" were ambiguous. However, "[l]egislative history is properly consulted only in light of a textual ambiguity." *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1071 (8th Cir. 2016). Here, the Court does not find section 922(o) ambiguous, and thus sees no need to resort to legislative history. Instead, the statute should be interpreted in accordance with its plain terms: it is illegal for someone to possess a machine gun unless the person can establish that the possession is "by or under the authority of" a government agency. *See Just*, 74 F.3d at 904.

Moreover, to the extent there *is* ambiguity in section 922(o)(2)(A), the legislative history on which *Vest* relied did not actually resolve it. According to *Vest*, the problem with section

922(o)(2)(A) is that police officers have no way of knowing who has the authority to permit lawful possession of machine guns, or in what circumstances. To resolve this putative ambiguity, one would have expected *Vest* to search for clues in the Congressional record as to who in a given government agency has the power to authorize possession of a machine gun. Rather than focus on that question, however, *Vest* used stray comments from individual legislators to conclude that Congress never meant for police officers to be prosecuted at all. This is not an appropriate use of legislative history because: (a) it results in an interpretation of the statute that does not match the text itself, *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); and (b) it gives outsized impact to type of legislative history that the Supreme Court and Eighth Circuit have recognized as often unreliable, *see In re Walton*, 866 F.2d 981, 983 (8th Cir. 1989) ("To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent, not the stray comments by individual legislators on the floors of the House and Senate." (citation and internal punctuation omitted)).

Finally, the Court disagrees with *Vest*'s suggestion that courts should get into the business of deciding whether some violations of criminal statutes are "mere technical violations" for which prosecution is inappropriate. 448 F. Supp. 2d at 1011. Under separation of powers principles, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v Hayes*, 434 U.S. 357, 364 (1978). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Here, the Government had probable cause to believe Wendt violated section 922(o) when he, while off duty, took a machine gun purportedly owned by the City of Adair to a site more than fifty miles away for an event sponsored by Wendt's private gun business and for which the private gun business received the proceeds. Wendt had a full and fair opportunity to defend the charge by presenting evidence that the event fell within the scope of his official duties as Police Chief. The jury disagreed, concluding the Government proved each element of Count 15 beyond a reasonable doubt. It is not the Court's prerogative to decide whether the Government should have brought the charge in the first place.

For these reasons, the Court rejects Wendt's vagueness argument as to all eleven counts of conviction.

*C. Sufficiency of the Evidence.*

Wendt's remaining arguments revolve around the sufficiency of the evidence. Before addressing those arguments, however, the Court must address a preliminary issue: the exaggerations in Wendt's briefs regarding the trial record. Wendt argues that "[t]he Government's case was based on scaring jurors about guns and hiding the ball on what really mattered. The Government took every opportunity to bring in guns to persuade the jury -- some one by one for effect and others in groups." (ECF 353-1, p. 33.) This argument mischaracterizes the record. The Court issued a pretrial ruling stating that the Government would not be allowed to "dwell on the issue of dangerousness [of machine guns] or otherwise attempt to appeal to jurors' emotions." (ECF 310, p. 19.) The Court also placed limits on the presence of machine guns in the courtroom. (Id.) The Government fully complied with these rulings. The Court does not recall any testimony about "dangerousness" at all, nor did the Government do anything to appeal to jurors' emotions. Moreover, the Government brought each machine gun into the courtroom only once, only briefly, and solely to provide context for the charges against Wendt, all of which—at the risk of stating the obvious—revolved around his (or his business's) acquisition and/or possession of machine guns. In these circumstances, it is unhelpful and inaccurate for Wendt to accuse the Government of "scaring jurors" or "t[aking] every opportunity to bring in guns." (ECF 353-1, p. 33.)

Wendt also complains about the Government's presentation of evidence regarding miniguns, which are high powered machine guns capable of shooting thousands of rounds per minute. Although Wendt argues that this evidence was solely designed to "scare" jurors, the reality is that Count 10 charged him with making false statements in a demonstration law letter to try to obtain ATF approval to *acquire* a minigun. (*See* Govt. Ex. 249.) In other words, the evidence about miniguns was directly relevant to one of the charges against him. It follows that the Government did not act improperly in presenting this evidence.

1. Count 1: Conspiracy to Make False Statements.

Turning to the merits, Wendt asks for his conviction on the conspiracy charge (Count 1) to be overturned on several grounds: (1) the alleged errors discussed above in the jury instructions; (2) one of Wendt's alleged co-conspirators, Jonathan Marcum, testified that he did not believe he or Wendt made false statements or did anything wrong; (3) another alleged co-conspirator, Robert

Williams, did not testify at all; (4) Wendt never received or intended to receive any improper benefit from the demonstration law letters he wrote to Marcum and Williams; and (5) the underlying false statement charges are unconstitutionally vague. (ECF 353-1, pp. 37–38.) All five arguments fail.

The first argument fails because, as discussed above, the jury instructions accurately summarized the law. The second fails because Marcum's subjective belief as to whether he and Wendt did something wrong is not even admissible, much less dispositive. *See United States v. Thirion*, 813 F.2d 146, 156 (8th Cir. 1987) (holding that a witness's opinion that the defendant was innocent "is inadmissible as it invades the province of the jury"). To that end, and setting aside Marcum's opinions about whether he and Wendt broke the law, the evidence showed: Wendt and Marcum traded text messages about Marcum's "ideas how to make some good money for both of us"; Wendt signed law letters for Marcum using his Police Chief title stating the Adair Police Department's purported interest in the machine guns; Wendt's letters allowed Marcum to obtain machine guns for his gun business located hundreds of miles away from Adair; Wendt never told Marcum the Adair Police Department was actually interested in purchasing such machine guns, nor did Marcum ever demonstrate them for the Adair Police Department; and Wendt and Marcum agreed that Marcum would share the proceeds from the expected resale of the machine guns with the Adair Police Department. In these circumstances, the jury had more than enough evidence to disregard Marcum's lay opinion testimony and find Wendt guilty of conspiracy to make false statements to ATF.

Wendt's third argument—that alleged co-conspirator Williams did not testify—fails for similar reasons. Wendt has not cited, and the Court is unaware, of any authority holding that the Government must present testimony from a co-conspirator to sustain a jury verdict on conspiracy. Here, even without testimony from Williams, the jury heard evidence that Wendt wrote so many demonstration law letters for Williams for so many different machine guns that Wendt finally said, "I don't know which is which now." (ECF 349-3, p. 1 ("Govt. Ex. 304").) These letters even included one that Wendt wrote for Williams *after* Williams had already started the process of acquiring a machine gun for himself. (*See* Govt. Ex. 247; ECF 349-2 ("Govt. Ex. 303").) In other words, Wendt helped Williams "backfill" the record by writing a demonstration law letter for the machine gun in question. (Govt. Ex. 247.) The jury had sufficient evidence to find Wendt guilty of conspiring with Williams irrespective of whether the latter testified.

22

Wendt's fourth argument—that he never intended to receive an improper benefit from conspiring with Williams and Marcum—fails because in a conspiracy to make false statements, the Government is not required to prove that a defendant received or intended to receive an improper benefit. Finally, Wendt's fifth argument fails because, for reasons explained in the preceding section, the conspiracy and false statements charges are not unconstitutionally vague. For these reasons, the Court will not disturb the jury's verdict on Count 1, which is supported by sufficient evidence.

    2.   Count 3: False Statements in Purchase Law Letter.

The jury also had sufficient evidence to find Wendt guilty on Count 3, which charged him with making false statements in a purchase law letter dated March 3, 2022, for the acquisition of three MP7A2 machine guns. (*See* Govt. Ex. 251.) The purchase law letter was signed by Wendt and stated, in part: "These firearms will be the property of our Adair Police Department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties." (Id., p. 1.) For reasons explained above, the Court rejects Wendt's argument that the inclusion of language regarding "official use" in Final Instruction Nos. 26 and 29 misstated the law or otherwise impacted the validity of the jury's verdict on Count 3.

As it relates to the sufficiency of the evidence, the jury heard evidence that Wendt had acquired or tried to acquire dozens of machine guns in the years leading up to March 2022, to the point where he sent a message to someone in September 2021 saying: "Lol I'm chief of police bitch . . . I have about 50 [machine guns] already need more . . . I love full autos." (Govt. Ex. 402, p. 3.) The jury also heard evidence that Wendt made profits from the sale of several machine guns and hoped to make more; for example, there were Facebook messages from Wendt stating, among other things, that "[m]achine guns are worth bank money" and he planned to "[b]uild up bunch [of] machine guns then once you retire or turn in your FFL you can sell them to any class three dealer. . . ." (Govt. Ex. 401, p. 1.) On February 1, 2022—just one month before the purchase law letter at issue in Count 3—Wendt sent a message stating: "I retire in December . . . Glad I got year left buying [as] many machine guns as I can [then] bailing." (Govt. Ex. 402, p. 3.) Against this backdrop, a reasonable juror could conclude that Wendt knowingly made a false statement when he said the machine guns "are not being acquired for the purpose of resale or transfer…."

A reasonable juror also could have concluded that Wendt knowingly made a false statement when he said the machine guns "will be used to carry out [the Adair Police Department's] official

responsibilities and duties." The Adair Police Department has two full-time officers and serves a rural community of less than 1,000 people. It is difficult to imagine that Wendt believed both full-time officers—plus the third, part-time officer—needed their own machine guns to carry out their duties. Instead, in context, the evidence was sufficient to sustain the jury's verdict on Count 3 that Wendt made one or more false statements in the purchase law letter dated March 3, 2022.

      3.   Counts 6 and 8 through 14: False Statements in Demonstration Law Letters.

The evidence is similarly sufficient to sustain the jury's verdict on Counts 6 and 8 through 14 that Wendt made false statements in demonstration law letters. Below, the Court will briefly summarize the evidence surrounding each of those charges. First, though, it is important to take a step back and consider the larger context. During the four-plus years after Wendt was named Police Chief, he wrote dozens of letters claiming the Adair Police Department was interested in demonstrations of, collectively, more than fifty machine guns. It strains common sense that a two-person police agency in rural Iowa would find machine guns to be "suitable" for their department's use or, even if they were, that the department was interested in potentially purchasing *dozens of them*.

Against that backdrop, the evidence on each of Counts 6 and 8 through 14 is more than sufficient to sustain the jury's verdict. Count 6 involved a demonstration law letter dated January 15, 2019, from Wendt to Marcum expressing the City's putative interest in the demonstration of four H&K machine guns and two SIG machine guns. (*See* ECF 348-70 ("Govt. Ex. 211"); Govt. Ex. 212.) The letter stated that the "Adair Police Department is requesting a firearms demonstration by Marcum MFG LLC. This demonstration will evaluate the firearms listed below for possible purchase for official duties for our department . . . The number of sworn certified officers in our department is 6 . . . The firearm requested for demonstration is particularly suitable for use for government agencies." (Govt. Ex. 211, p. 1.) At trial, Marcum testified that he had an agreement with Wendt in which Marcum's business would use the demonstration law letters to obtain ATF approval to acquire the machine guns, which Marcum intended to then turn around and resell for a profit. Marcum said he and Wendt agreed to share the profits between Marcum's business and the City of Adair.

If the jury believed this testimony—which, of course, is squarely within its province—it means the City of Adair had no interest in the "possible purchase" of the machine guns "for official duties for our department." Instead, Wendt's demonstration law letter made false statements to

facilitate Marcum's acquisition and resale of the firearms for his gun business in Indiana. It follows that there was sufficient evidence to conclude Wendt made materially false statements. The Court will not disturb the guilty verdict on Count 6.

The jury also had sufficient evidence to find Wendt guilty on Count 8, which involved a demonstration law letter to BW Outfitters dated July 19, 2020, for the "formal demonstration of the M2 HB-QCB, 12.7mmx99mm (Full Auto) Machinegun, manufactured by FNH USA LLC to be conducted for the Adair Police." (Govt. Ex. 225, p. 1.) Wendt's letter stated that the Adair Police Department "would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department in special operations and patrol, based on its price and availability." (Id.) There are at least two aspects of these statements that a reasonable juror could have found materially false.

First, the statement that the Adair Police Department was interested in determining whether the firearm—which is colloquially referred to as a "Ma Deuce"[8]—was "suitable for future purchase" would have been materially false if the jury concluded that Wendt's only purpose for submitting the letter was to acquire the gun for himself or his gun store. A reasonable juror could have reached this very conclusion given, *inter alia*: (a) the overall quantity of machine guns Wendt purportedly wanted to have demonstrated for the Adair Police Department in the months and years leading up to July 2020 (far more than a small, rural police department could possibly need); and (b) Wendt's Facebook messages stating things like, "I'm building machine gun arsenal" and "This chief police [g]ig is awesome . . . Send machine guns to my own gun store lol . . . Just need the title." (Govt. Ex. 402, p. 1.)

Second, and similarly, a reasonable juror could have found the statement that the "firearm requested for demonstration is ideal for the use by the Adair Police Department in special operations and patrol, based on its price and availability" to be false. There was evidence indicating that Wendt had no interest, intent, or desire to acquire the gun for the Adair Police Department, much less put it into use in "special operations" or "patrol." Indeed, Wendt all but admitted this in Facebook messages in December 2020 to Marc Khananisho, a gun dealer/manufacturer, regarding miniguns. Khananisho told Wendt it would be difficult to obtain ATF approval for a minigun, saying: "I can't think of any legit reasoning . . . that's the tricky part with mini guns." (ECF 349-

---

[8] ECF 363, p. 57.

8, p. 4 ("Govt. Ex. 404").) Wendt responded: "No reason for deuce either lol I can use that letter change model." (Id.) In other words, Wendt admitted there was "[n]o reason" why a Ma Deuce would be suitable for use by a small police department in a rural area, yet Wendt wrote the demonstration law letter saying it was "suitable" anyway. The evidence was sufficient to sustain the verdict on Count 8.

The evidence was also sufficient to sustain the verdict on Count 9, which involved a demonstration law letter dated January 18, 2021, to Arms Unlimited, Inc., a gun dealer in Las Vegas, Nevada. The letter contained, in part, similar statements to the letter at issue in Count 8, including that the Adair Police Department wanted a demonstration of one or more machine guns "for possible future purchases and use of our officers in the performance of their official duties . . . The firearms requested for demonstration are particularly suitable for use as law enforcement weapon. The weapon requested are particularly suitable for our officers while conducting special operations and high-risk prisoner transportation details." (Govt. Ex. 235, p. 1.) A reasonable juror could find these statements to have been materially false for similar reasons to those identified above in connection with Count 8; namely, (i) the small Adair Police Department had no interest in the "possible future purchases and use" of the firearms, and instead Wendt was simply facilitating his business's acquisition of machine guns; and (ii) Wendt did not consider the weapon to be "particularly suitable" for the Police Department's work in "special operations" or "high-risk prisoner transportation details" given the Department's small size and rural location.

The letter at issue in Count 9 also went further in one respect than the letter at issue in Count 8, in that Wendt also stated: "Each officer will have an opportunity to fire the weapon(s) which will require the machine guns to fire thousands of rounds. This type of testing during the demonstration will show the reliability of the firearm to the department." (Id.) The evidence showed that no Adair police officer ever traveled to Las Vegas to test-fire machine guns (much less to fire "thousands of rounds"), nor did any representative from Arms Unlimited ever travel to Adair for that purpose. A reasonable juror therefore could conclude that Wendt was lying when he said Adair officers would have the opportunity to fire the weapon or that the Adair Police Department was interested in evaluating "reliability." The Court will not disturb the verdict on Count 9.

Count 10 involved a demonstration law letter dated November 29, 2021, for the putative demonstration of the minigun, which is a machine gun capable of firing thousands of rounds per

minute and typically mounted on a helicopter or other aircraft. Wendt's demonstration law letter claimed the "Adair Police Department would like a demonstration of the GAU-2b/A Machine Gun manufactured by DeGroat Tactical Armaments for possible future purchase and use of our Officers in the performance of their official duties . . . The firearm requested for the demonstration is particularly suitable for use as a law enforcement weapon." (Govt. Ex. 249, p. 1.) At the risk of stating the obvious, a reasonable juror could conclude that these statements were false given the high-powered nature of the weapon and the fact that the two or three-person Adair Police Department has no helicopter or other aircraft or vehicle on which to mount it.

Moreover, the Government presented evidence reflecting Wendt's *personal* interest in acquiring a minigun, including many Facebook messages with Khnanisho in December 2020. (*See* Govt. Ex. 404; *see also* Govt. Ex. 402, p. 2 ("I'm about done at PD too tired 100 hr weeks such . . . I want mini[gun] tho lol.").) In the course of those messages, Khnanisho expressed concerns about whether ATF would approve the transfer of a minigun, telling Wendt that "[a]pproval all depends on how your letter is stated etc." (Govt. Ex. 404, p. 3.) A few messages later, Wendt responded: "Most examiners don't even know what they are looking at [as] long as it's all done correctly." (Id.) Later, Wendt asked if there was "[a]ny specific way you think I should word [the law letter]." (Id., p. 4.) Khnanisho responded, "I can't think of any legit reasoning . . . that's the tricky part with mini guns." (Id.) Wendt replied: "No reason for deuce[9] either lol I can use that letter change model." (Id., p. 5.) In essence, Wendt admitted there was no reason why the Adair Police Department would need a minigun, yet he wrote a letter stating that it wanted a demonstration of one anyway "for possible future purchase and use of our Officers." There was sufficient evidence to allow a reasonable juror to conclude this statement was false, and thus to sustain the conviction on Count 10.

The evidence is also sufficient to support Wendt's conviction on Counts 11 and 12, which involve particularly audacious facts. Both of those Counts involved demonstration law letters dated March 1, 2022, to TM Firearms LLC (an Alabama-based gun dealer) for fully automatic machine guns, the first an MP5SD3 (Count 11) and the second an MP7A2 (Count 12). In both letters, Wendt stated: "I am writing to request a formal demonstration of the [machine gun] to be conducted for the Adair Police. Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair

---

[9] In context, the reference to "deuce" was to the "Ma Deuce" machine gun at issue in Count 8.

Police Dept." (Govt. Ex. 214, p. 4; Govt. Ex. 223, p. 11.) These statements are remarkable because the machine guns in question *were already owned by the Adair Police Department*. It should go without saying that a reasonable juror could conclude Wendt lied when he said the Adair Police Department was interested in seeing a demonstration of machine guns it already owned. The same juror further could conclude that Wendt's real purpose in making the statements was to facilitate the sale of those machine guns at substantial profit to himself and his gun business. There is sufficient evidence to support Wendt's convictions on Counts 11 and 12.

Count 13 involved a demonstration law letter dated July 1, 2022, to Palm Beach Shooting Organization LLC, in Boynton Beach, Florida, for "formal demonstration of the G36C (Full Auto) 5.56 Machinegun . . . to be conducted for the Adair Police." (Govt. Ex. 253, p. 1.) "Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies." (Id.) A reasonable juror could conclude that these statements were false given the evidence summarized above regarding the small size of the Adair Police Department and the dozens of other firearms Wendt claimed the Adair Police Department was purportedly interested in "demonstrating" during the preceding months and years, as well as Wendt's admissions in Facebook messages that his primary goal was to enrich himself and his gun business through the acquisition of machine guns. There is sufficient evidence to sustain the jury's verdict on Count 13.

Finally, Count 14 involved a demonstration law letter dated August 28, 2021, to Williams Contracting LLC stating: "I am writing to request a formal demonstration of the IO INC Model: Sporter Caliber: 7.62X39 Manufacturer: Grain Sporting Goods LLC/GRAIN SG to be conducted for the Adair Police." (Govt. Ex. 247, p. 1.) "Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept. . . . The firearm requested for demonstration is ideal for the use by the Adair Police Department as it is similar in design to other approved weapons currently in use by our agency and surrounding agencies." (Id.) The evidence showed that Williams approached Wendt about writing this letter after Williams had already agreed to acquire the machine gun. (*See* Govt. Ex. 303.) This is backwards from how one would expect a demonstration law letter to work; typically, the government agency should be the one expressing interest to the

gun dealer, not the other way around. In these circumstances, a reasonable juror could conclude that Wendt made false statements about the Adair Police Department's putative interest in the machine gun to help Williams "backfill" the record and acquire a machine gun he otherwise could not have acquired. Indeed, the evidence showed that Wendt had a recurring practice of writing law letters for Williams to use to acquire machine guns, with Wendt eventually complaining that he had written so many letters for Williams that "I don't know which is which now." (Govt. Ex. 304, p. 1.) There is sufficient evidence to sustain the jury's verdict on Count 14.

   4. Count 15: Illegal Possession of a Machine Gun.

   Wendt's final count of conviction, Count 15, was for unlawful possession of a machine gun at the event in Woodbine, Iowa, on April 16, 2022, in violation of 18 U.S.C. § 922(o). The machine gun in question was registered to the City of Adair, and the Government's theory was that Wendt possessed it in his *personal* capacity and not as part of his official duties as Police Chief. The Court explained above why the evidence was sufficient to support the Government's theory, particularly the evidence establishing: Wendt was off duty and not in uniform; Woodbine is more than fifty miles from Adair; the event was sponsored by Wendt's business, not the City of Adair; and all proceeds from the event went to the business, not the City. The Court therefore will not disturb the jury's verdict on Count 15.

## V. LEGAL ANALYSIS: MOTION FOR NEW TRIAL.

   The Court has broader discretion when considering a motion for new trial. It may "weigh the evidence" and "choose to believe or disbelieve witnesses." *Lemoine*, 2024 WL 2968075, at *4. As it is, this case doesn't require the Court to re-weigh the evidence or evaluate witness credibility. For Counts 1, 3, 6, and 8 through 14, the government presented a straightforward false statements case that was corroborated by Wendt's messages and the law letters. The messages showed that, in Wendt's words, he wanted to "[b]uild up [a] bunch [of] machine guns"—a "machine gun arsenal"—to make "bank money" when he sold them upon retirement. (Govt. Ex. 401, p. 1; Govt. Ex. 402, p. 1.) Since he had a "couple ffls" and the Chief title there was "no limit to what [he] c[ould] get." (Govt. Ex. 402, p. 2.) True to his word, Wendt didn't limit himself. During his time as Chief, he authored dozens of law letters expressing a present intent for the Adair Police Department to purchase machine guns not for "resale or transfer" or to demonstrate them, to determine if they were suitable for "future purchase" and "official use." These statements were inconsistent with the statements he made to his friends and the reality of being Chief of a rural,

three-person police department. *See Kelerchian*, 937 F.3d at 908 ("From the content of these letters, a reasonable jury could find that these were false requests for demonstrations. The letters could have had no other purpose."). The Court cannot say that "a serious miscarriage of justice" may have occurred, *see Rice*, 449 F.3d at 893, and therefore DENIES Wendt's Motion for New Trial as to Counts 1, 3, 6, and 8 through 14.

For the reasons set out above, the Court DENIES Wendt's Motion for a New Trial as to Count 15, as well. The evidence showed that Wendt was off duty when he possessed the machine gun on April 16, 2022, during an event over fifty miles from Adair that his business sponsored. The Court cannot conclude it was a "serious miscarriage of justice" for the jury to find he possessed the machine gun in his personal capacity. *Id.*; *see also Warner*, 5 F.3d at 1381 (section 922(o)(2)(A) "was enacted so that military personnel and police officers, *when acting officially*, could utilize and possess machine guns" (emphasis added)).

VI.    **CONCLUSION.**

The jury instructions adequately stated the law, and the evidence was sufficient to support the jury's verdict on each of the eleven counts of conviction, none of which were based on unconstitutionally vague charges. The Court therefore DENIES Wendt's Motion for Judgment of Acquittal and/or New Trial. (ECF 353.)

IT IS SO ORDERED.

Dated: June 20, 2024

_____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE