IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 4:22-cr-199 |
| | ) | |
| v. | ) | GOVERNMENT'S |
| | ) | SENTENCING |
| BRADLEY EUGENE WENDT, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Brad Wendt was the chief of police in Adair, Iowa, a town of 800 people and a police force of two. He also owns and operates a gun dealing business—BW Outfitters—that was authorized to deal in machine guns. For four years, Wendt exploited his position to buy and sell machine guns for himself and his friends, all for their own personal profit. He should go to prison for 84 months.

## TABLE OF CONTENTS

BACKGROUND...................................................................................................2

FACTUAL OBJECTIONS...................................................................................2

GUIDELINES DISPUTES..................................................................................7

A.  The cross-reference under §2B1.1(c)(3) applies to calculate the guidelines under §2K2.1, as to Counts 1, 3, 6, 8, 9, 13, and 18...........................................7

B.  The offense involved 25 or more firearms. ..............................................13

C.  Abuse of a position of trust under §3B1.3 applies. ..................................18

D.  The government does not seek the upward adjustment for an aggravating role under §3B1.1(c)..........................................................................................20

E.  Obstruction of justice under §3C1.1 applies. ...........................................21

F.  There is no credit for acceptance of responsibility under §3E1.1.............26

SENTENCING GUIDELINES...........................................................................27

SENTENCE ........................................................................................................28

CONCLUSION....................................................................................................32

## BACKGROUND

Defendant Bradley Wendt was charged with 20 crimes: conspiracy to make false statements to and defraud the ATF (Count 1); making false statements to the ATF (Counts 2-19); and illegal possession of a machine gun (Count 20).  To streamline trial, the government dismissed Counts 10-12, 17, and 19.

On February 6, 2024, Wendt proceeded to trial on 14 counts charged against him.  On February 14, 2024, the jury convicted Wendt of eleven counts: Counts 1, 3, 6, 8, 9, 13-16, 18, and 20.

## FACTUAL OBJECTIONS

Wendt makes many factual objections to the Presentence Investigation Report (PSR).  The facts in the PSR were taken directly from the evidence presented at trial, with some limited supplementation.  On balance, Wendt appears to simply disagree with the interpretations and conclusions to be drawn from that evidence, often adding commentary.  Wendt also uses his objections to the PSR to make clarifications he believes should be included or to further litigate his factual guilt.

**Paragraphs 7-12**.  The recitation of the law in these paragraphs tracks the Court's jury instructions.

**Paragraphs 16-188 (generally).**  Wendt says the PSR "mispresents several key aspects of the offense conduct."  Def. Obj. ¶ 2, pp. 4-9.  Here, Wendt does not cite specific paragraphs to which he objects, but general categories of information or evidence he believes should either be included in the PSR or clarify facts in the PSR.

Clarification 1: Wendt suggests that machine guns are "extremely common among law enforcement in Iowa." Def. Obj. ¶ 2, p. 4. Even assuming this is true, it's not relevant. The PSR is appropriately focused on Wendt's unlawful conduct—getting machine guns through false law letters.

Clarification 2: Wendt says the City of Adair asked him to be the Chief of Police. Def. Obj. ¶ 2, p. 4. The PSR correctly states that Wendt submitted a letter to the City of Adair, proposing they make him the Chief of Police. PSR ¶ 14, GTX 552. Regardless of the exact mechanism, it is undisputed that Wendt became the Chief of Police on July 2, 2018, and authored his first law letter for a machine gun just 17 days later. PSR ¶ 16.

Clarification 3: Wendt notes that the then-Mayor (John Larsen) and City Council approved his acquisition of machine guns for the Adair Police Department, and the then-City Clerk (Randi Lehman) helped Wendt draft law letters. Def's Obj. ¶ 2, p. 4) As the Court is already aware, most of the City Council had no knowledge of Wendt's quest for machine guns. *See* Dkt. 248, GX 21, 22, 23 (prior statements of three City Council members). Former City Council member Jeremy Gettler testified at trial to an off-the-record conversation Wendt had with him about getting machine guns, though he previously told Special Agent Kevin Kohler that he had no such knowledge. *Id.* at GX 20 (statement of Gettler to Kohler). Similarly, contrary to his testimony at trial, former Mayor John Larsen was "totally unaware that the City owned machine guns" and had "never ever" authorized Wendt to purchase machine guns. GSX 1. And former City Clerk Randi Lehman also changed course at trial,

3

having previously told Agent Kohler that she had no knowledge of the City acquiring or owning machine guns at any point; that it was never discussed at City Council meetings; that she had never seen law letters; and she did not know they were being drafted on City letterhead.  GSX 2.  What the City Council knew or authorized is, at best, murky.  But, again, it doesn't matter.  The City Council didn't authorize, and couldn't authorize, Wendt to lie to the ATF.

Clarifications 4 and 5:  Wendt observes that a police officer using his or her own money to purchase a machine gun by use for the police department is lawful. Def's Obj. ¶ 2, p. 5.  That's true, provided the machine gun is, in fact, for the use of the police department and not simply a means of personal profit.  He also says he was "in a truly unique position as both a licensed dealer and a police chief," which he told the ATF.  Wendt was not charged with or convicted of concealing his dual role, but exploiting it.

Clarifications 6 and 7:  With these clarifications, Wendt continues to litigate his conviction for illegal possession of the US Ordnance M60 machine gun at the BW Outfitters shoot in April 2022.  Def's Obj. ¶ 2, pp. 5-6. The jury heard the evidence at trial, including the information outlined in paragraphs 61-64 of the PSR, and found Wendt was not acting within the scope of his official duties when he possessed the M60.

<u>Clarifications 8 through 14:</u>[1]   Wendt simply uses these as an opportunity to disagree with the government's theory of the case and to argue his defense to the charges—not to the accuracy of any fact in the PSR.  Def's Obj. ¶ 2 pp. 6-9.  There are no discernible objections to the PSR in these paragraphs.  Moreover, many of Wendt's clarifications appear to center on his trial testimony, which was, at times, demonstrably false and which, generally, the Court should not credit.

<u>Clarification 15:</u>   Wendt states he never received any money or any other improper benefit for writing a demonstration law letter.  Def's Obj. ¶ p. 9.  Wendt received many benefits from writing law letters, including machine guns for his personal use and enjoyment, as well as his friends' use and enjoyment, and goodwill from those for whom he fraudulently wrote letters.  To the extent Wendt means he was not paid to write law letters, the PSR does not suggest he was (save for the arrangement Marcum testified about at trial, where they would sell the machine guns at a profit and 10% would go to the Adair Police Department).

**Additional objections.**  After his broad commentary on the offense conduct, Wendt then proceeds to identify specific paragraphs with which he takes issue.  Def's Obj. ¶¶ 3-38, pp. 9-21.  Many of these "objections" are duplicative of the broad concerns he identified above.  *Compare, e.g.*, Def's Obj. ¶ 2, pp. 5-6, *with* ¶ 36, p. 19 (on his defense to the illegal possession of the US Ordnance M60); ¶ 2, p. 5, *with* ¶¶ 5-6, pp. 11-12 (disclosing to the ATF that he was both the chief of police and a licensed

---

[1] In listing his general complaints with the PSR, Wendt goes from "twelfth" to "fourteenth" and does not have a "thirteenth."

dealer).  And, again, most of Wendt's objections are simply commentary on the evidence presented and interpretations of that evidence, rather than a factual objection.  Where Wendt makes discernible factual objections distinct from his above commentary, the government responds as follows:

Paragraphs 16-27:  Wendt broadly objects to these paragraphs related to his dealings with Johnathan Marcum.  The facts here are just that: they recite Marcum's trial testimony (consistent with his prior grand jury testimony in GSX 9) and the evidence in this case (text messages, law letters).  Wendt doesn't appear to dispute these events factually occurred but wants to supplement with his interpretation of the evidence.  For example, Wendt's acquittal of two substantive false statements counts does not mean the text messages exchanged between Wendt and Marcum in October 2018 never happened.  Wendt is free to argue the weight the Court should give to Marcum's testimony or the other evidence of Wendt's dealing with Marcum, but the PSR is factually accurate.[2]

Paragraphs 24, 33, 44:  Wendt characterizes many of his text or Facebook messages as "off-hand comments" or without corroborating evidence of his intent.  *See*, *e.g.*, Def's Obj. ¶¶ 12, 18, 21, 29, pp. 15-16, 17.  He does not deny making them.

Paragraph 65:  Wendt contends this paragraph "misrepresents the number and nature of the requests for purchases." Def's Obj. ¶ 37, p. 20.  He does not explain how

---

[2] As made clear below, the government does not ask the Court to rely on any acquitted charges in calculating the guidelines.  But, where proven by a preponderance of the evidence, the facts surrounding those charges are appropriately included in the PSR and should be considered for Section 3553(a) purposes.

or why this summary is inaccurate.  Between April 2019 and March 2022, Wendt placed orders requesting 31 machine guns be transferred to the Adair Police Department.  GTX 701, 214-16, 221-23, 240, 241, 245, 246, 250-52.

Paragraph 67:  Wendt says, "there were never 90 machine guns."  Def's Obj. ¶ 39, p. 21.  The PSR correctly states that, in total, "Wendt requested 90 machine guns for purchase by or demonstration to the Adair Police Department."  PSR ¶ 67; *see also* GTX 701.  It further clarifies that "49 machine guns were in fact transferred on law letters signed by Wendt."  *Id.*  That is an accurate summary of the requested and completed transfers.  GTX 701.

## GUIDELINES DISPUTES

### A.   The cross-reference under §2B1.1(c)(3) applies to calculate the guidelines under §2K2.1, as to Counts 1, 3, 6, 8, 9, 13, and 18.

The PSR correctly applies the cross-reference in USSG §2B1.1(c)(3) to calculate the advisory guidelines range for Counts 1, 3, 6, 8, 9, 13, and 18 under §2K2.1. *See* PSR ¶¶ 75, 78.

Wendt was convicted of nine counts of making false statements under 18 U.S.C. § 1001(a)(2).  Where the "conduct set forth in the count of conviction [for making a false statement] establishes an offense specifically covered by another guideline," Section 2B1.1(c)(3) provides a cross-reference to apply the guideline governing the other offense.  To apply the cross-reference, courts look to the "conduct alleged in the count of the indictment of which the defendant is convicted" to determine whether such conduct "establishes the elements of another offense." *See United States v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006) (internal quotation marks

omitted) (rejecting the district court's application cross-reference for a guideline under §2L2.1 for trafficking in immigration documents when the indictment alleged the false statement to ICE was about knowing the purpose of an overnight trip to Iowa) (quoting *United States v. Genao*, 343 F.3d 578, 583 (2d Cir. 2003).

As relevant here, Wendt was convicted of nine counts of making false statements to the ATF and conspiracy to make false statements to the ATF, involving statements he made in purchase and demonstration law letters. The convictions on Counts 1, 3, 6, 8, 9, 13, and 18, establish a violation of 18 U.S.C. § 922(a)(6), on the basis of the conduct alleged and proven. Section 922(a)(6) makes it unlawful to make false statements in connection with the acquisition or attempted acquisition of a firearm from a licensed dealer, importer, or manufacturer. To establish a violation of Section 922(a)(6), the government would have to prove:

(1)     Wendt made a false statement in connection with the acquisition or attempted acquisition of a firearm from a licensed firearms dealer, importer, or manufacturer;

(2)     Wendt did so knowingly; and

(3)     The statement was intended to or likely to deceive the dealer, importer, or manufacturer with respect to any fact material to the lawfulness of the sale or other disposition of the firearm.

*The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, 2023 Ed., p. 351.[3]

---

[3] For convictions on Counts 14, 15, and 16, Wendt (BW Outfitters) made false statements to transfer machine guns to another licensed dealer (here, TM Firearms and Palm Beach Shooting Organization). As such, Wendt made a false statement in connection with the acquisition of attempted acquisition of machine guns by those transferees (TM Firearms and PBSO) from a licensed firearm dealer (BW Outfitters

First, Wendt knowingly made false statements to a licensed dealer, importer, or manufacturer in connection with his acquisition or attempted acquisition of firearms. Although Wendt was convicted of making these false statements to the ATF, the false statements were necessarily made and supplied first to a licensed dealer, importer, or manufacturer, who would then submit the transfer paperwork and demonstration or purchase law letter to the ATF.[4] The written application to

_____

as to Counts 14 and 15), satisfying the first two elements. However, the false statement was not intended to deceive the dealer (BW Outfitters) because Wendt had knowledge of the false statement and was, accordingly, not deceived by the statement. In Count 16, the firearm was not being obtained from a licensed dealer (it was from a law enforcement agency). In other words, Counts 14, 15, and 16 do not establish violations of 18 U.S.C. § 922(a)(6).

Ordinarily, where a licensed dealer has knowledge of the false statement, there is nonetheless a violation of 18 U.S.C. § 924(a)(1)(A), which makes it unlawful for a person to "knowingly make[] any false statement or representation to the information required by this chapter to be kept in the records of a person licensed under this chapter." Similarly, it is unlawful for any licensed dealer, like Wendt, to "make[] any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under the chapter." 18 U.S.C. § 924(a)(3)(A). The government has not, and does not, ask the Court to find that a demonstration law letter is required to be kept in the records of a licensed dealer.

Even if Counts 14, 15, and 16 are excluded from the applicable cross-reference to USSG §2K2.1, the remaining counts of conviction establish violations of 18 U.S.C. § 922(a)(6). Because Counts 14, 15, and 16 each involve substantially the same harm as Counts 1, 3, 5, 6, 8, 9, 13, and 18, they should be grouped. USSG §3D1.2(d).

[4] Often, Wendt used a broker, or intermediary dealer, to acquire and attempt to acquire machine guns. In these circumstances, Wendt would provide the false statement (law letter) to the broker-dealer, who would in turn submit the false statement (law letter) to the manufacturer or importer. Meaning: Wendt's false statements were made to and induced action by more than one licensed dealer, manufacturer, or importer.

9

transfer, to which the demonstration or purchase law letter is attached, is required by law. *See* 26 U.S.C. § 5812(a); Dkt. 310 at 8. The below table sets forth the count of conviction, knowing false statement, and the licensed dealer, importer, or manufacturer to whom Wendt made the false statement. Wendt's conviction under Count 1—conspiracy to make false statements—similarly establishes a conspiracy to make false statements during the acquisition or attempted acquisition of firearms.

| Count | False Statement | Dealer, importer, manufacturer |
|---|---|---|
| 3 | Purchase law letter dated March 3, 2022, stating the requested machine guns "will be the property of our Adair Police Department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties." | Dealer: ProForce |
| 1 & 6 | Demonstration law letter dated January 15, 2019, requesting demonstration of six machine guns (including H&K, MP5SD2, 9mm and H&K, MP5/40A3), stating: "This demonstration will evaluate the firearms listed below for possible purchase for official duties of our department." | Dealers: Ares State Armory (GTX 211, p. 2) Shoot Straight Tampa (GTX 212, p. 2) |
| 8 | Demonstration law letter dated July 19, 2020, requesting "formal demonstration" of an FN M2HB-QCB ("Ma Deuce") because the department "would appreciate a detailed overview of the state weapon to further determine if it is suitable for future purchase, and official use." | Dealers: ProForce, FN America |
| 9 | Demonstration law letter dated January 18, 2021, requesting demonstration of a US Ordnance, M2A2, .50 caliber machine gun, "for possible future purchases and use of our officers in the performance of their official duties." | Dealer / Manufacturer: US Ordnance |

| Count | False Statement | Dealer, importer, manufacturer |
|-------|-----------------|--------------------------------|
| **13** | Demonstration law letter dated November 29, 2021, requesting demonstration of a DeGroat Tactical Armaments, GAU-2B/A, 7.62mm (minigun) "for possible future purchase and use of our Officers in the performance of their official duties." | Dealer / Manufacturer: DeGroat Tactical Armaments |
| **1 & 18** | Demonstration law letter dated August 28, 2021, requesting demonstration of a Grain Sporting Goods LLC, Sporter, 7.62x39mm machine gun to "test and evaluate" to "further determine if it is suitable for future purchase, and official use." | Dealer / Manufacturer: Grain Sporting Goods LLC |

Each of the false statements above was intended to or likely to deceive the dealer, importer, or manufacturer with respect to a fact material to the lawfulness of the sale or transfer of the firearm. With respect to Count 3, the Court has repeatedly recognized that the relevant regulatory and statutory framework required the Adair Police Department—through Wendt—to obtain machine guns only for its official use. Dkt. 260, pp. 9-11; Dkt. 310, pp. 7-8, 17; Final Jury Instr. No. 24 (Dkt 330). In other words, under the law, the MP7A2s could only lawfully be transferred if they were, in fact, for the Adair Police Department. Because it is unlawful to transfer machine guns to a law enforcement agency where the intent—at the time of transfer—is to resell the machine guns, Wendt's affirmative statement that the machine guns were "not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties" was material to the lawfulness of the sale.

The same is true for Counts 6, 8, 9, 13, and 18. Again, the Court has repeatedly recognized that the relevant regulatory and statutory framework required machine

guns transferred to a federal firearms licensee for "demonstration" be in anticipation of possible future sales to the department requesting the demonstration.  Dkt. 310, pp. 7-8, 17; Final Jury Instr. No. 24.  That is, after all, the entire purpose of the carve out for dealers.  Accordingly, transfers of machine guns to dealers for some other purpose—like Wendt's personal use, enjoyment, or profit—are not lawful.  Because it's unlawful for a dealer to obtain a machine gun for some other, non-sales purpose, Wendt's repeated statements that the machine guns he sought to obtain (for himself or Williams) were "for possible future purchase" or "to further determine if it is suitable for future purchase" were material to the lawfulness of the sale of those machine guns.

In each of Counts 1, 3, 6, 8, 9, 13, and 18, the conduct in the counts of conviction establishes violations of Section 922(a)(6) (and conspiracy to commit a violation of Section 922(a)(6))—triggering the cross-reference in §2B1.1(c)(3) and the application of the guidelines under §2K2.1. *Cf. United States v. Arturo Garcia*, 590 F.3d 308, 310 (5th Cir. 2009) (upholding application of §2L1.1 for transporting or harboring an unlawful alien when the count of conviction alleged defendant made a false statement about the passenger's citizenship to a border officer to aid in the entry to the United States); *United States v. Nucera*, 67 F.4th 146 (3d Cir. 2023) (rejecting application of cross-reference to §2H1.1 where defendant's false statement about committing a civil rights violation did not itself constitute a civil rights violation).[5]

---

[5] Regardless of the Court's application of the cross-reference in §2B1.1(c) to §2K2.1, the base offense level remains 18.  Wendt was convicted of Count 20—illegal possession of a machine gun—which dictates application of §2K2.1.

**B.      The offense involved 25 or more firearms.**

The relevant conduct in this case—which includes the firearms that were unlawfully sought to be obtained—involved more than 25 firearms, for a six-level upward adjustment under USSG §2K2.1(b)(1)(C).  *See* USSG §2K2.1, comment. (n.5) ("For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer.").

The jury convicted Wendt of making specific false statements to obtain or facilitate the distribution of the following machine guns and unlawfully possessing the following machine guns (as to Count 20):

| Count | Charge | # of firearms |
|---|---|---|
| 3 | False statement on purchase law letter, dated March 3, 2022, purchasing: 3 H&K MP7A2, 4.6x30mm, at $2,405.97 each | 3 |
| 6 | False statement on demonstration law letter to Marcum Mfg, dated October 31, 2018, requesting demonstration of:<br>• 1 H&K, MP5SD2, 9mm<br>• 1 H&K, UMP40, 40 S&W<br>• 1 H&K, MP5/40A3, 40 S&W<br>• 1 H&K, MP5A2, 9mm<br>• 1 SIG, 516, 5.56mm<br>• 1 SIG, SG 551-2P SWAT, 223/5.56mm | 6 |
| 8 | False statement on demonstration law letter to BW Outfitters, dated July 19, 2020, requesting demonstration of: 1 FN M2HB-QCB | 1 |

| Count | Charge | # of firearms |
|:---:|:---|:---:|
| **9** | False statement on demonstration law letter to Arms Unlimited, dated January 18, 2021, requesting demonstration of: 1 US Ordnance, M2A2, .50 caliber | **1** |
| **13** | False statement on demonstration law letter to BW Outfitters, dated November 29, 2021, requesting demonstration of: 1 DeGroat Tactical Armaments, GAU-2B/A, 7.62mm | **1** |
| **14** | False statement on demonstration law letter to TM Firearms, dated March 1, 2022, requesting demonstration of: 1 H&K, MP5SD3 (Full Auto), 9mm | **1** |
| **15** | False statement on demonstration law letter to TM Firearms, dated March 1, 2022, requesting demonstration of: 1 H&K, MP7A2 (Full Auto), 4.6x30mm | **1** |
| **16** | False statement on demonstration law letter to Palm Beach Shooting Organization, dated July 1, 2022, requesting demonstration of: 1 H&K, G36C (Full Auto), 5.56mm | **1** |
| **18** | False statement on demonstration law letter to Williams Contracting, dated August 28, 2021, requesting demonstration of: 1 Grain Sporting Goods LLC, Sporter, 7.62x39mm | **1** |
| **20** | Illegal possession of a machine gun (US Ordnance M60), registered to the Adair Police Department | **1** |
| **Total firearms involved in substantive counts of conviction** | | **17** |

In addition, the Court should find, by a preponderance of the evidence, that Wendt also unlawfully sought to obtain, unlawfully possessed, or unlawfully distributed the following machine guns: [6]

| PSR ¶ | Description | # of firearms |
|---|---|---|
| **50-53** | False statements on demonstration law letters to Objectiv Solutions, dated August 2, 2021, requesting demonstration of:<br>• 1 H&K MP7A1<br>• 1 H&K G36C<br>• 1 H&K 416 | **3** |
| **65** | False statement on purchase law letter, dated August 19, 2021, purchasing: 3 H&K MP7A1, 4.6x30mm, at $2,187.15 each | **3** |
| **55-60** | False statements on 6 demonstration law letters to Williams Contracting LLC (various dates), requesting demonstration of 9 machine guns | **9** |
| **65** | False statement on purchase law letter, dated March 9, 2022, purchasing:<br>• 3 B&T MP9-N, 9mm para, at $1,928 each<br>• 3 B&T SMG APC9 SD, 9mm para, at $2,785 | **6** |
| **61-64** | Illegal possession of a machine gun, registered to the Adair Police Department, at machine gun shoot hosted by Wendt in his personal capacity<br>• H&K MP7A2<br>• H&K G36K<br>• HK 416 | **3** |
| **Minimum additional firearms involved in relevant conduct** | | **24** |

---

[6] Although the evidence shows—by a preponderance—that Wendt unlawfully sought to obtain, possess, or facilitate the transfer of many other charged machine guns, the government does not ask the Court to rely on any machine guns that were the subject of false statements counts for which Wendt was not convicted. The Court can—and should—consider other relevant conduct (both presented at trial and solely for purposes of sentencing) that was not implicated by the jury's verdicts.

<u>Transfers to Objectiv Solutions / Attempted Purchase of MP7A1s</u>

In August 2021, Wendt helped his friend, Ray Ohl, sell three machine guns to a Florida-based buyer, Objectiv Solutions.  To facilitate Ohl's sale of those guns (an HK MP7A1, HK G36C, and HK 416), Wendt wrote three demonstration law letters, requesting the Florida-based company demonstrate the machine guns to the Adair Police Department for its future possible purchase.  At the time of this demonstration request, Ohl and Wendt were friends, and Ohl was employed part-time with the Adair Police Department.  If the Adair Police Department genuinely wanted a demonstration of those machine guns, Ohl simply could have demonstrated them for Wendt.  In fact, at the time of the August 2021 letters, the Adair Police Department already had an HK 416—it certainly did not need a demonstration of another one.[7]  But, of course, the real purpose of these demonstration letters was not to provide the Adair Police Department with a demonstration, it was merely a way for Wendt to do his friend a favor: to facilitate Ohl's sale of the machine guns to a buyer.  Ultimately, Ohl profited over $30,000 from the sale of these three machine guns to Objectiv Solutions.

When Wendt facilitated the sale of Ohl's MP7A1 to Objectiv Solutions, he learned of the significant profit to be made on the secondary market for that make and model of machine gun.  Which is why, a few weeks later, he placed an order for

_____

[7] Wendt testified at trial that the HK 416 that Ohl had was different than the HK 416 Wendt had, which is why he wanted Objectiv Solutions to demonstrate it to the Adair Police Department.  Wendt TT, p. 76.  But, Ohl and Wendt purchased their HK 416s within 15 days of each other.  PSR ¶ 52, n.4; GTX 221, 242.

16

three MP7A1 machine guns.  PSR ¶ 53; GTX 245.

Attempted Purchase of B&T Machine Guns

In March 2022, Wendt attempted to purchase six B&T machine guns purportedly for the Adair Police Department.  PSR ¶ 53; GTX 252.  He made this purchase despite already having pending purchase orders for two Uzis, two Galils, two more FN-SCARs, three HK MP7A1s, and three more MP7A2s.  GTX 701, p. 3.  In other words, while Wendt was waiting on 12 machine guns to be transferred to his two-man department, he went ahead and ordered six more.  And, Wendt made this purchase despite his plans to retire in December 2022.  GTX 402, p. 3.

These six machine guns were not for the Adair Police Department.  Like Wendt's attempted purchase of the MP7A1s and MP7A2s, Wendt was buying these six machine guns for the sole purpose of reselling them.  It was, after all, his plan to "buy[] [as] many machine guns as I can" before "bailing."  GTX 402, p. 3.

Possession of Adair Police Department Guns at Shoot

The jury found Wendt guilty of unlawfully possessing a machine gun—a US Ordnance M60 registered to the Adair Police Department—at a machine gun shoot he personally hosted with BW Outfitters.  But the M60 wasn't the only machine gun registered to the Adair Police Department that Wendt had available for the public to shoot.  In the run up to the April 2022 shoot, he advertised that an HK MP7, G36, and 416 would each be at the public shoot.  PSR ¶ 62.  Each of those machine guns was registered to the Adair Police Department.  *Id.*  An undercover agent shot the MP7 (so did Wendt's girlfriend in an advertisement for the shoot) and a random

17

paying member of the public shot the G36K. *Id.*; GTX 603, 609. Wendt unlawfully possessed these machine guns when he had them in his personal capacity, just as he did the US Ordnance M60.

### Machine Guns Obtained for Robert Williams

Wendt was charged with, and convicted of, conspiring with Robert Williams to make false statements to the ATF. In August 2020, Williams became authorized to deal in machine guns. About a month later, Wendt began writing demonstration law letters for Williams to get machine guns, purportedly for demonstration to the Adair Police Department. PSR ¶¶ 55-60. Over the next year, Wendt wrote law letters for 10 machine guns for Williams. *Id.* ¶ 56. Williams, for his part, recognized that this was all part of a long-term investment. Dkt. 182-1, p. 3 (Williams' interview report). And that he "had a problem"—an inordinate interest in stockpiling machine guns. GSX 1. Wendt did not have a bona fide interest in purchasing these machine guns. It was, as with Ohl, a favor for a friend. Wendt simply wanted to help Williams get machine guns, for Williams' personal use and for their shared machine gun shoots.[8]

## C.    Abuse of a position of trust under §3B1.3 applies.

Wendt objects to the application of an upward adjustment for abuse of a position of trust under §3B1.3. This adjustment is correctly applied.

-------

[8] Whether Wendt and Williams in fact "demonstrated" these machine guns is irrelevant. That was simply a box to be checked. By lying to the ATF to obtain the machine guns, Wendt sought to unlawfully obtain them. *See* USSG §2K2.1, comment. (n.5).

A two-level upward adjustment applies if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." USSG §3B1.3. "Because police officers clearly occupy positions of public trust, the inquiry in most cases is whether [a] defendant used a police officer's special knowledge or access to facilitate or conceal the offense." *United States v. Gilbert*, 721 F.3d 1000, 1007 (8th Cir. 2013) (cleaned up).

Wendt says he did not abuse a position of trust because (1) he "had permission"; and (2) "his conduct actually helped others and cost the City of Adair nothing." Def. Obj. ¶ 44, pp. 25-26. Neither is relevant here. Wendt was convicted of conspiring to make, and making, false statements to the ATF and illegally possessing a machine gun. He did not have "permission" from anyone to lie to the ATF or illegally possess a machine gun. Nor would it matter if he did. Wendt's position of public trust is just that: *public*. Whether his longtime friends on the City Council acquiesced to his antics says nothing of the public's trust in Wendt—trust that he wouldn't use the position for his own personal profit and that he wouldn't stay the chief of police just to get machine guns. *See* GTX 402, p. 2 ("Gotta be chief tho for machine guns."). Wendt committed many crimes as the chief of police, and that itself is an abuse of the public's trust. *United States v. Rehal*, 940 F.2d 1, 5 (1st Cir. 1991) ("Needless to say, a police officer occupies a position of pubic trust, and the commission of a crime by a police officer constitutes an abuse of that trust."); *United States v. Foreman*, 926 F.2d 792, 796 (9th Cir. 1990) ("The public, including fellow law enforcement agents, expect that police officers will not violate the laws they are charged with enforcing.").

Wendt's position as the chief of police provided him with access to pull off his scheme.  In fact, he was a necessary part of the scheme: the law letters *required* the signature and backing of the chief of police.  Absent Wendt's position of public trust, he would not have had the authority or ability to acquire these machine guns at all.  Nor could he acquire machine guns for co-conspirators Johnathan Marcum or Robert Williams.  Because Wendt abused his position as the chief of police to "facilitate" the offense, the adjustment applies.

### D. The government does not seek the upward adjustment for an aggravating role under §3B1.1(c).

The PSR scores a two-level upward adjustment for Wendt's aggravating role in the offense.  PSR ¶ 82.  Wendt played a crucial role in this crime—it literally could not have happened without him.  And he is substantially more culpable than any other participant; he was the only participant to both exploit his position as the police chief *and* financially benefit.  However, under the particular facts of this case, the government does not seek a formal aggravating role adjustment.  The Court should nevertheless consider Wendt's relative culpability and role in imposing sentence.  *See* USSG §3B1.1, comment. (n.2) (an upward departure may be warranted for a defendant who does not receive an adjustment but who "exercised management responsibility over the property, assets, or activities").

Perversely, Wendt argues he should get a mitigating role reduction.  Def's Obj. ¶ 45, pp. 26-27.  He claims, "the jury found Wendt never intended to violate the

law." *Id.*[9]  And, with respect to his illegal possession of the US Ordnance M60, Wendt says that "there has been no other person convicted of such a charge under similar circumstances." *Id.*  Neither has anything to do with a mitigating role adjustment. For the same reason the Court should consider an upward variance or departure for Wendt's critical role and substantial culpability in these crimes, it should reject a mitigating role.

### E.   Obstruction of justice under §3C1.1 applies.

Wendt objects to an upward adjustment for obstruction of justice under §3C1.1. Def's Obj. ¶ 46, p. 27. Wendt gave false testimony at his trial.  The adjustment applies.

Where a defendant willfully obstructs or impedes, or attempts to obstruct or impede, the administration of justice, a two-level upward adjustment applies. USSG §3C1.1.  Relevant here, the adjustment applies to a defendant who commits perjury. *Id.*, comment. (n.4(B)).  "A district court may apply the two-level increase under §3C1.1 if it finds by a preponderance of the evidence that a defendant committed perjury, i.e., that he willfully testified falsely as to a material matter." *United States v. King*, 854 F.3d 433, 446 (8th Cir. 2017) (cleaned up).  "The false testimony or statements need not have caused the government actual prejudice to be material." *Id.* (cleaned up).

---

[9] This is, of course, not the case.  The jury convicted Wendt of *knowingly* making false statements to the ATF and conspiring with others to do the same. Although the government did not have to prove—and the jury did not have to find— Wendt *intended* to break the law, knowingly lying to the ATF seems like a good indication he did.

Wendt committed perjury. He testified at trial for several hours, making many, many false statements. Testimony of note, and the evidence contradicting that testimony, is discussed below.

<u>Ma Deuce:</u> Wendt wrote a demonstration law letter (from himself to himself), requesting that BW Outfitters demonstrate a "Ma Deuce" – a .50 caliber belt-fed machine gun – to the Adair Police Department "to further determine if it is suitable for future purchase, and official use by the sworn officers with Adair Police Dept." PSR ¶ 37. Shortly after he ordered the Ma Deuce, he told a Facebook friend, "I just ordered ma deuce lol they just keep getting bigger." PSR ¶ 38; GTX 402, p. 2. Fully equipped, the Ma Deuce weighs over 100 pounds and is over five feet long. PSR ¶ 37. Wendt said, "couple ffls and being chief of police there's no limit to what you can get. That's bad combo cause they just get more expensive." PSR ¶ 38; GTX 402, p. 2. When Wendt received the Ma Deuce – purportedly for demonstration to the Adair Police Department – he immediately mounted it on his personal Humvee. GTX 403. Wendt later admitted there was "no reason for [the ma] deuce." GTX 404, p. 5.

At trial, Wendt testified that he got the Ma Deuce because he needed to decide if it was "suitable" for the Adair Police Department. Wendt TT, pp. 105-08.[10] Wendt testified that the only way to decide whether this .50 caliber, belt-fed, hummer-mounted machine gun was suitable for his two-man department was to demonstrate it. *Id.* And, according to Wendt, it was only *after* that demonstration that he

---

[10] Citations to Wendt's trial testimony will be cited as "Wendt TT," followed by page number, and refer to the transcript filed at Docket 363.

determined the Ma Deuce was not, in fact, suitable – that there was "no reason" for it. *Id.* at 107.

Wendt's testimony is belied by the evidence and, again, the jury's verdict.  The jury convicted Wendt of making a false statement to the ATF to get the Ma Deuce; specifically, that Wendt knowingly and falsely told the ATF that he was requesting demonstration of the Ma Deuce to determine if it was suitable for future purchase by the Adair Police Department. Wendt wanted the Ma Deuce for the same reason he wanted so many other machine guns: for his own use and enjoyment.

Robert Williams:   On August 2, 2021, Williams won a machine gun (Grain Sporting Sporter) in an online auction.  He emailed Wendt: "Line item #3 is the AK I won. Can I please get a law letter for it?  Thank you!!"  PSR ¶¶ 59-60; GTX 303, p. 1. Wendt wrote him a law letter.  In another email exchange, Williams told Wendt that an online seller was "after" Williams for a law letter.  PSR ¶¶ 57; GTX 304.  Wendt responded, "well fuck im busy too," and then, "i need a copy of there form you have so many going on I don't know which is which now."  PSR ¶¶ 57; GTX 304.

As discussed above, the evidence showed none of the letters Wendt wrote for Williams were legitimate requests for demonstration. But Wendt testified they were. He testified on direct examination that these were all bona fide demonstration letters for Williams—for machine guns Wendt wanted to demonstrate for the Adair Police Department. *See* Wendt TT, p. 61. Wendt testified, "I informed him that I was always looking for new and improved or different models to test and evaluate for the purchase of our agency" and that if Williams "came across any, he would let me

know." *Id.* Wendt further testified that he wrote these demonstration law letters "To evaluate the weapons. That's why I did them all." *Id.* at 63. When asked if Wendt was "actually interested in those [machine guns]," he responded, "Absolutely." *Id.*

This testimony was false, and the jury specifically rejected it. They found Wendt guilty of conspiring with Williams to make false statements to the ATF. They also found Wendt guilty of writing a false demonstration letter for the purchase of the Grain Sporting Sporter, the "AK" Williams won first and asked for a law letter after. Although the Court must make an independent finding of untruthfulness, it's clear the jury found Wendt's testimony false.

Finally, at the conclusion of his direct, Wendt testified:

Q:   Did you ever make any statement to the ATF you believed to be false in any law letter?
A:   No.
Q:   Did you ever make any statements you did not believe was true to the ATF?
A:   No.
Q:   Did you ever enter into any sort of agreement or understanding with anyone to defraud the ATF in any way?
A:   No.
Q:   Did you ever have any sort of agreement or understanding with anyone to make a false statement to the ATF?
A:   No.

Wendt TT, p. 91.

By testifying that he never said anything he "did not believe was true to the ATF," Wendt testified that every law letter he wrote to the ATF contained true statements. In other words, he testified that every machine gun he sought to get on a demonstration law letter was for demonstration to the Adair Police Department for its future possible purchase.

That would include, for example, his request to demonstrate a minigun—an electric-driven, six-barrel Gatling-style gun—which he arranged to buy for $80,000. PSR ¶¶ 42, 45. The same minigun that he repeatedly told the manufacturer he wanted for his machine gun shoots (*id.* ¶¶ 46, 48) and was part of the reason he couldn't retire as the chief of police (GTX 402, p. 2 (saying he would be done at the police department but "I want mini tho lol")). Wendt's false testimony is only borne out by his later actions. After ATF denied Wendt the minigun, he became authorized to manufacture machine guns. And he obtained a minigun parts kit from James DeGroat. Wendt's actions make clear: that minigun was never intended for demonstration to the Adair Police Department, it was always just for Wendt himself. His testimony to the contrary was false.

The jury, again, rejected Wendt's testimony about the minigun and lots of other demonstration letters. In all, Wendt was convicted of conspiracy to make false statements to the ATF and 10 counts of making false statements to the ATF. To find Wendt guilty, the jury had to find, among other things, that Wendt made *at least* 10 false statements to the ATF and *knew* each was untrue when he made it. *See* Final Jury Instruction No. 17 (Dkt. 330). It's simple: Wendt testified he didn't knowingly make false statements to the ATF and the jury found he did. The Court should find he committed perjury and apply the obstruction of justice enhancement under §3C1.1.

**F.    There is no credit for acceptance of responsibility under §3E1.1.**

Wendt claims he is entitled to credit for acceptance of responsibility, after an 8-day jury trial where he vehemently contested his factual guilt.  Def's Obj. ¶ 47, p. 27. He is wrong.

A defendant is entitled to a two-level decrease in offense level if he "clearly demonstrated" acceptance of responsibility. USSG §3E1.1(a). Generally, this adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt." USSG §3E1.1, comment. (n.2). "A defendant who has proceeded to trial may overcome this bar to a reduced sentence in the rare instance when the issues for trial did not relate to factual guilt." *United States v. Perry*, 640 F.3d 805, 813 (8th Cir. 2011).

Wendt is not that rare case.  He did not go to trial to preserve a legal argument. He went to trial to mount a factual attack on his guilt—and he still maintains his factual innocence.  He vigorously cross-examined the government's witnesses and presented an extensive defense case.  And he testified (falsely) that he did not lie to the ATF.  *See* USSG §3E1.1, comment. (n.4) ("Conduct resulting in [an obstruction of justice enhancement] ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.").  He has not accepted any responsibility for his conduct. *United States v. Bennett*, 91 F.4th 918, 923 (8th Cir. 2024) (denying credit for acceptance of responsibility where a defendant contended his factual guilt at trial, even where the jury found him guilty of a lesser-included offense).

## SENTENCING GUIDELINES

Based on the above, the applicable advisory guidelines range for convictions on Counts 1, 3, 6, 8, 9, 13-16, and 20, is:

| | |
|---|---|
| Base Offense Level (§2B1.1(c)(3), §2K2.1(a)(5)) | 18 |
| Involved 25 to 99 firearms (§2K2.1(b)(1)(C)) | +6 |
| Abuse of a position of trust (§3B1.3) | +2 |
| Obstruction of justice (§3C1.1) | +2 |
| Total Offense Level | 28 |
| Advisory guidelines range: | 78 to 97 months' prison |

In addition to the range of imprisonment, the guidelines recommend a fine of $25,000 to $250,000.  USSG §5E1.2(c)(3).

The Court should impose a fine of $250,000.  Wendt has assets.  He has a profitable business—BW Outfitters—which has had gross profits nearing a million dollars annually.  *See* PSR ¶ 146.  BW Outfitters was central to his scheme; he bought machine guns purportedly for the Adair Police Department but always intended for his business.  He hosted a machine gun shoot with BW Outfitters, where patrons paid to shoot machine guns that he unlawfully obtained for BW Outfitters and machine guns registered to the Adair Police Department.  Wendt spent over $150,000 on machine guns in four years.  GTX 702.  He had an additional $70,000 in pending and cancelled orders—money he was planning to spend.  *Id.*  He sold six machine guns for a profit of nearly $80,000—and kept $45,000.  GTX 703.  He planned to stockpile machine guns to sell off when he closed up shop, or "just change[d] name on [his] ffl

lol." GTX 401. He has a personal gun collection that he estimates to be worth $200,000 (PSR ¶136)—a collection he can't have as a felon. A fine of $250,000 reflects the profits Wendt made and intended to make, and he can afford it.

## SENTENCE

The Court should sentence Wendt to 84 months in prison.

For four years, Wendt exploited his position as the Adair Chief of Police to get machine guns for himself and his friends. He lied to the ATF and to the other dealers to make that happen. He sought machine guns that were ludicrous for his small-town department—a .50 caliber Ma Deuce that he immediately mounted to his personal Humvee and a six-barrel, electric-driven minigun. When the ATF had the audacity to tell him "no," he fought them. He wasn't forthcoming; he was entitled. And, for Wendt, that's a pattern. At every turn in this investigation and prosecution, Wendt has shown us the same thing: he thinks he is untouchable.

On August 31, 2022, search warrants were executed at Wendt's house, his businesses, and the Adair Police Department. Wendt was interviewed by the ATF and FBI. His friends and family and coworkers and supervisors were interviewed. Every machine gun he bought was taken. Yet, Wendt's concern was that ATF wasn't being gentle enough with the machine guns, damaging them and diminishing their value. GSX 4. Wendt has repeatedly said over these proceedings that August 31 was a dramatic event and an extraordinary act by the federal government. Yet, just days later, apparently nonplussed by these dramatic events, Wendt left on his pre-planned vacation to "hunt bears or something." Dkt. 228 p. 24. And, despite knowing the

grand jury was investigating how he got machine guns, Wendt made sure he got his license to manufacture them. *See* Dkt. 288-1 (detailing Wendt's application). Undoubtedly, to manufacture the minigun that he had been denied by ATF.

In December 2022, Wendt was indicted on twenty counts, after a months-long investigation. Wendt was charged with exploiting his position as the chief of police to get machine guns for himself. Days later, the BW Outfitters Facebook account posted this:



GSX 5, p. 1. Wendt was arraigned in January 2023, and was told as a condition of release that he couldn't leave the country. Dkt. 19. Instead, he quickly requested

permission to leave the country.   Dkt. 66.   Wendt asked to travel to Mexico on a $60,000 expedition to hunt a desert sheep.   *Id.*

He appeared unconcerned about the serious charges against him.

In the run up to trial, BW Outfitters continued to make inflammatory Facebook posts, denigrating the ATF.   GSX 5, pp. 2-3.   And the week before trial started, Wendt did something else: he got his minigun.   Dkt. 364, pp. 37-38; 41-44. Or, at least the kit necessary to build his minigun.   *Id.*   The minigun that he told the ATF was for demonstration to the Adair Police Department but was—as made apparent by his ongoing quest to get one—just for him all along.

Wendt perjured himself at his trial.   He was convicted of eleven felonies.   After his conviction, the Iowa Department of Public Safety instructed the Crawford County Sheriff's Office (where Wendt lives) to serve a notice of suspension and revocation of Iowa permit to carry weapons on Wendt and obtain his peace officer credentials. GSX 7.   They tried to serve Wendt, but he refused service in person.   *Id.*   He wouldn't accept certified mailings.   *Id.*   He was belligerent.   *Id.*   He wouldn't turn over his permit to carry or peace officer credentials.   *Id.*

Contrary to the picture Wendt painted at trial—and will undoubtedly claim as mitigation at his sentencing—Wendt does not have an illustrious law enforcement career.   He has worked at department after department, often for short stints.   GSX 13, p. 4.   He has been terminated from three different law enforcement jobs for misconduct: Dallas County Sheriff's Office, Harlan Police Department, and Denison Police Department.   GSX 6, p. 4; GSX 10; GSX 11; GSX 12; GSX 13, pp. 4-6.   He sued

two of those departments in response.  GSX 6, p. 4; GSX 11; GSX 12.  His motives and candor have been questioned by more than one judge.  GSX 6, pp. 4, 14; GSX 13, pp. 17-18.  And then, of course, he exploited his final law enforcement position for his own personal gain.

Wendt urges the Court to consider the sentences imposed on co-conspirators Johnathan Marcum and Robert Williams, and Dorian LaCourse (the other chief of police who provided Marcum with law letters).  But those defendants pled guilty and did not obstruct justice.  More instructive are the sentences of similarly situated dealers and law enforcement who, like Wendt, did not accept responsibility:

*United States v. Theunick et al.*, 651 F.3d 578 (6th Cir. 2011).  Defendants Gary Theunick and Frederick MacKinnon were state prosecutors who used their authority to get machine guns and silencers for their personal use.  Defendant Maxwell Garnett was the chief of police in a town of 800 people, who also got machine guns and silencers for his personal use and facilitated Theunick's and MacKinnon's purchases and possession.  All three went to trial.  All three were convicted.  Theunick received a sentence of 63 months in prison; MacKinnon received a sentence of 60 months in prison; and Garnett received a sentence of 71 months in prison.

*United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019).  Defendant Vahan Kelerchian was a licensed firearms dealer, who worked with two officers to defraud H&K into selling them restricted machine guns purportedly for their department but were in fact for resale.  Kelerchian also solicited false demonstration law letters to

build up his personal machine gun collection.  He went to trial and was convicted.  He received a sentence of 100 months in prison.

But, even then, as Wendt has so often put it: his case is unique.  It's unique because Wendt is the only defendant in any of these schemes who was both the chief of police exploiting his position and the dealer benefitting from it.  The only defendant who said he wanted to demonstrate an $80,000 machine gun to a two-man department.

From start to finish, Wendt has believed the rules don't apply to him.  It's time for him to realize they do.

## CONCLUSION

The Court should impose a sentence of 84 months in prison.

Respectfully submitted,

Richard D. Westphal
United States Attorney

By:   */s/ Mikaela J. Shotwell*
Mikaela J. Shotwell
Shai D. Gonzales
Assistant United States Attorneys
Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: Mikaela.Shotwell@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2024, I electronically filed the foregoing with the Clerk of Court using the CM ECF system.  I hereby certify that a copy of this document was served on the parties or attorneys of record and the United States Probation Officer by:

_____ U.S. Mail _____ Fax _____ Hand Delivery

_X_ ECF/Electronic filing ___ Other means (email)

UNITED STATES ATTORNEY

By:   _/s/ Mikaela J. Shotwell_